UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

- v. -

PAUL J. KONIGSBERG,

Defendant.

ORIGINAL

SEALED INDICTMENT

S11 10 Cr. 228 (LTS)

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: **SEP 2 6 2013**

COUNT ONE

(Conspiracy to Falsify the Records of a Broker-Dealer and an Investment Adviser)

The Grand Jury charges:

Relevant People and Entities

1. At all times relevant to this Indictment, Bernard L. Madoff Investment Securities LLC, and its predecessor, Bernard L. Madoff Investment Securities (collectively and separately, "Madoff Securities"), had its principal place of business in New York, New York. Madoff Securities operated three principal lines of business: market making, proprietary trading, and investment advisory. Madoff Securities was registered with the United States Securities and Exchange Commission ("SEC") as a broker-dealer since in or about 1960 and as an investment adviser since in or about August 2006. Madoff Securities also had a London-based affiliate, Madoff Securities International Ltd. ("Madoff International"), which engaged principally in proprietary trading.

2. Bernard L. Madoff ("Madoff") was the founder of Madoff Securities and its sole owner; Madoff also owned the majority of voting shares of Madoff International.

3. In December 2008, Madoff Securities collapsed after its investment advisory business was revealed to be a massive fraud. While Madoff and his co-conspirators had

promised investors in Madoff Securities that their money would be invested in stocks, options, and other securities of well-known corporations, that money was in fact virtually never invested as promised. Instead, as described further below, the Madoff Securities investment advisory business operated as a massive Ponzi scheme in which some investors were paid with money "invested" by different investors, and other proceeds were used to personally benefit Madoff and the people around him. At the time of its collapse in December 2008, Madoff Securities maintained more than 4,000 investment advisory client accounts, which purported to have a combined balance of approximately $65 billion. In fact, Madoff Securities only had about $300 million in assets at the time.

4.     PAUL J. KONIGSBERG, the defendant, was at all relevant times the senior tax partner with Konigsberg Wolf & Co., P.C. ("Konigsberg Wolf"), a certified public accounting firm located in New York, New York, that offered tax, accounting, and consulting services. In addition to being a licensed CPA, KONIGSBERG was a licensed attorney in New York State, and received a graduate legal degree in taxation. KONIGBSERG also held a small ownership interest in Madoff International, making him the only person outside of the Madoff family to hold an ownership interest in Madoff Securities or Madoff International.

### The Ponzi Scheme

5.     A "Ponzi scheme" is a particular type of financial fraud, in which an investment operation claims to pay returns to customers based on some promised investment strategy. In fact, however, in a Ponzi scheme, the perpetrator does not invest his client's money as promised; instead, one investor is paid from money "invested" by another.

6.     For more than three decades, the Madoff Securities investment advisory business was a Ponzi scheme. From at least as early as the 1970s through Madoff's arrest on December

11, 2008, Madoff and his co-conspirators perpetrated a scheme to defraud the investment advisory clients of Madoff Securities by accepting billions of dollars under false pretenses. They promised to invest clients' money in stocks, options, other securities, and financial instruments, and further promised that investors would achieve high rates of return with limited risk. But Madoff and his co-conspirators knew that the investment advisory client funds were not being invested as promised. Instead, Madoff and his co-conspirators misappropriated client money and converted it to their own use, whether by perpetuating the fraud or simply stealing it for their own use and the use of others.

7. In order to continue the fraud for so long, Madoff and his co-conspirators created and disseminated bogus account statements to Madoff Securities investment advisory clients, which purported to show that their money had been invested, when in fact it virtually never was. In particular, beginning in the 1970s and until the early 1990s, Madoff and his co-conspirators promised the bulk of Madoff Securities investment advisory clients that their money was invested in a so-called "convertible arbitrage" strategy, which involved paired trades of convertible securities and associated common stock. Beginning in the early 1990s, Madoff and his co-conspirators claimed that they had switched, for the majority of investment advisory accounts, to a so-called "split-strike conversion" strategy, which involved the purchase of common stocks hedged by options. In addition, since at least the 1970s, certain Madoff Securities clients maintained investment advisory accounts that did not purport to run the convertible arbitrage or split-strike conversion strategies. Those client accounts appeared to enjoy particularly high rates of return (up to 45 percent per year, and sometimes more), whereas the majority of the investment advisory accounts appeared to generate rates of return closer to 10-17 percent.

8. But regardless of whether a client's investment advisory account purported to run the convertible arbitrage strategy, the split-strike conversion strategy, or no particular strategy at all, the truth was that Madoff and his co-conspirators — with very rare exception — were not making any trades at all. Instead, Madoff Securities investment advisory account statements were created by using historical price information, which Madoff and his co-conspirators could manipulate to create whatever return (or, from time to time, loss) they desired.

9. As a result of the actions of Madoff and his co-conspirators, the Madoff Securities Ponzi scheme lasted for well over thirty years, until it finally collapsed under its own weight.

### PAUL KONIGSBERG Participated In, and Sometimes Directed, the Creation of False Books and Records at Madoff Securities

10. In order to keep his scheme hidden for so long, Madoff needed the assistance of certain willing outsiders that could be trusted to handle otherwise suspicious activity. In particular, Madoff directed many of his clients – including some of his most important customers, in whose accounts Madoff executed the most glaringly fraudulent transactions – to use PAUL J. KONIGSBERG, the defendant, as their accountant. By December 2008, Konigsberg Wolf handled various accounting assignments in connection with more than approximately 300 of the Madoff Securities investment advisory accounts. KONIGSBERG typically received duplicate monthly investment advisory account statements for his customers. And at times, KONIGSBERG dictated the transaction activity in his customers' accounts to employees of Madoff Securities, including Frank DiPascali, Jr., and another employee ("CC-1").

11. For example, Madoff frequently guaranteed his clients a specific rate of return. For certain customers' accounts, Madoff or one of his co-conspirators executed special transactions that were not part of one of the firm's usual (fake) trading strategies (*e.g.*, convertible arbitrage or split-strike conversion) – which the Madoff Securities employees

4

referred to as "schtup" trades – at the end of each year in order to meet the pre-determined return, or to pay some other agreed-upon compensation.

12.     PAUL J. KONIGSBERG, the defendant, was well aware of these trades, and sometimes had input into their composition. For example, one of Madoff's long-time clients ("Client-1") – who had previously recruited other investors and so was entitled to an annual payment equivalent to approximately 1% of the money he brought into Madoff Securities – died in or about 1994. Although Madoff honored his promise to make the additional payments to Client-1's widow, Madoff encouraged her to use KONIGSBERG as her accountant. After Client-1's death, the monthly statements for the six investment advisory accounts Client-1 controlled went solely to KONIGSBERG.

13.     In order to make the end-of-year payment easier to calculate, and to minimize the tax implications of the end-of-year "trades," Madoff, PAUL J. KONIGSBERG, the defendant, and DiPascali agreed on a simplified investment "strategy" for the Client-1 accounts. Specifically, they agreed that the Client-1 accounts would be "invested" in United States Treasury bonds and cash equivalents for the first eleven months of the year, but that DiPascali would execute back-dated options trades – which are treated more beneficially for tax purposes than transactions in equity securities – in December of each year in order to ensure the account achieved the guaranteed return. Over several years, each December, KONIGSBERG spoke with DiPascali to ensure that the appropriate options trades were "executed" to guarantee the correct rate of return in Client-1's widow's accounts.

14.     For example, Client-1's account statements for January through November 2003 reflect that Client-1's account was invested solely in U.S. Treasury bonds and money market funds, resulting in an approximate total account value of $860,000 at the end of November. In

5

December 2003, however, Client-1's account reflected four options transactions (two buys and two sells) netting an additional approximately $825,000, which had the effect of nearly doubling the value of the account. The December 2003 options trades, moreover, were back-dated in Client-1's account, having been inputted into Madoff Securities' computers in January 2004.

15. For the majority of Madoff's clients, the fraudulent trading activity was back-dated within a single month, such as the options trades for Client-1's widow described above. For certain clients, however, Madoff was able to create fake trades that were back-dated by many months in order to manipulate the returns in their accounts, sometimes for tax purposes.

16. For example, PAUL J. KONIGSBERG, the defendant, served as the accountant for another long-time Madoff Securities client ("Client-2"). In or about April 2003, while preparing Client-2's tax returns, KONIGSBERG instructed CC-1 to back-date losing trades in Client-2's account, for tax purposes. According to a note dated April 29, 2003, "Paul will call to give me a loss # to put thru last day in Dec. Trade to settle beg of Jan 03." Another note reflected that, for Client-2, "Jan losses were for 2002 Tax & were put on in May 2003."

17. A Madoff Securities worksheet reflecting fictitious trades purportedly executed on December 30 and 31, 2002 in Client-2's account likewise reflected the notation, "Paul OK'd this. I will run in morning." According to Madoff Securities' computer records, however, the same trades that "Paul OK'd" were actually entered into the firm's computer systems on or about May 13, 2003.

18. Madoff also convinced one of his oldest and most important customers ("Client-3") to use PAUL J. KONIGSBERG, the defendant, as his accountant. In fact, Madoff Securities paid a portion of KONIGSBERG's fees in connection with Client-3, because of Client-3's importance to Madoff. Specifically, for over a decade, Madoff Securities paid KONIGSBERG

6

approximately $15,000 to $25,000 per month on account of KONIGSBERG's handling of Client-3's affairs. Over the years, Client-3 deposited and withdrew tens of billions of dollars from Madoff Securities.

19. Client-3 was also a client of the private wealth group of a major financial institution ("Bank-1"), which received certain financial information about Client-3 and his family. In or about 1996 or 1997, employees of the Tax and Accounting group at Bank-1 noticed a large increase in the net worth of Client-3's children, as reflected on their December 1995 Madoff Securities investment advisory account statements. To address Bank-1's questions, PAUL J. KONIGSBERG, the defendant, met with a vice president of Bank-1. KONIGSBERG explained that as part of his estate planning, Client-3 had decided in late 1994 or early 1995, in conjunction with Madoff, to begin transferring his own wealth to his children. As a result, KONIGSBERG explained, Client-3 loaned hundreds of millions of dollars to his children, who then invested those funds (via Madoff Securities) in technology stocks, in order to generate higher returns. KONIGSBERG explained that by the end of 1995, Client-3's children were able to repay the loans while still booking hundreds of millions of dollars in trading profits.

20. In reality, however, no such loans or trading ever occurred. Rather, in or about March 1996, CC-1 opened three new accounts (one for Client-3, and one each for his two children) retroactive to January 1, 1995. CC-1, with DiPascali, then created an entire year's worth of monthly account statements for these accounts dating back to their purported opening in January 1995. Thus, the loan and investment program that PAUL J. KONIGSBERG, the defendant, had explained to Bank-1 as having originated in late 1994 or early 1995 was not, in fact, conceived until approximately February 1996.

21.     In addition, Madoff Securities employees sometimes asked certain customers to return account statements to the firm, so that they could replace the original statements with "amended" ones reflecting new or different false trading activity. Madoff could ask this of only certain clients, since replacing a statement – sometimes one several months old – that reflected particular securities positions with "amended" statements reflecting entirely different positions, and resulting in entirely different account values, risked exposing the fraud.

22.     PAUL J. KONIGSBERG, the defendant, was one of the people that Madoff could trust to return account statements to be "amended." For example, Client-3 and his family of accounts was frequently the beneficiary of "amended" statements.

23.     Because Madoff did not want multiple versions of the same months' statement to exist outside of his firm simultaneously, Madoff Securities employees kept careful track of original and amended statements. For example, a notebook maintained by one of the Madoff Securities employees contained the following entries, among others:

> 11/1/05
> Paul returned original [Client-3] for Aug. & Sept.
> Sent out corrected statements for [one Client-3 account] Aug & Sept.
> Plus [another Client-3 account] Aug. & Sept.
>
> *  *  *
>
> 3/1/07
> Paul Konigsberg sent back Sept. & Oct. 2006 statements for [Client-3's accounts].
>
> *  *  *
>
> A Fedex was sent marked confidential to Paul w/ all [Client-3] statements months July – October 2008 on 11/28/08

24.     Similarly, in or about late 2002 or early 2003, CC-1 created a year's worth of profitable, back-dated trades in the account of another Madoff Securities client ("Client-4"), who was also a client of PAUL J. KONIGSBERG, the defendant. CC-1's notes in connection with the amended statements read, "Do not send corrected statements until we get Paul & [Client-4's] copies."

25.     In a letter dated April 2003 – after CC-1 had redone Client-4's 2002 statements to reflect significant back-dated investment gains – Client-4 wrote, in pertinent part:

> Paulie Dear,
> Here is copy of note on details I worked with [CC-1].
> Both Bernie & [CC-1] are aware of problems we have.
> June is target for action.

26.     In or about June 2003, CC-1 caused back-dated losing trades to be reflected in Client-4's accounts, minimizing the adverse tax consequences of the back-dated winning trades CC-1 had caused to be reflected in Client-4's 2002 statements.

27.     And likewise, in or about 2008, CC-1 created "amended" statements for another investment advisory client of Madoff Securities ("Client-5"), who used the accounting services of PAUL J. KONIGSBERG, the defendant. Client-5 owed Madoff $1.6 million, which Madoff was going to recoup by back-dating losing trades in Client-5's account. In order to accomplish that goal, both Client-5 and KONIGBSERG, who received duplicate account statements, needed to return the original statements first. And in fact, the original statements – crossed-out to reflect that they were no longer current – were returned to CC-1. A note on the original February 2008 statement stated, "Rec. only Paul's copy. Not [Client-5's] copy of 2/29/08." A similar post-it note was on the original, crossed-out April 2008 statement. And another note made by CC-1 read:

9

> Corrected statements
> Keep in hanging folder.
> Do not mail out!
> We never received his original statement back (from [Client-5])
> He told Bernie he sends everything to Paul &
> Paul told Bernie he shreds whatever he doesn't need!

### KONIGSBERG Arranges a No-Show Job

28. In or about 1992, after a different accounting firm that bundled client funds for investment in Madoff Securities was shut down by the SEC, Madoff required the various other "bundlers" to have their clients invest directly in Madoff Securities, rather than going through an intermediary. At the same time, Madoff offered to make an annual cash payment to the "bundlers," determined as a percentage of funds attributable to that "bundler's" investors. For example, as discussed above, Madoff agreed to pay Client-1 1% of the money Client-1's investors deposited at Madoff Securities.

29. At the same time, Madoff offered PAUL J. KONISBERG, the defendant, an additional cash payment of approximately $20,000 per year. Rather than receiving this money in the form of trading profits, as many others elected to, KONIGSBERG instructed Madoff to pay a relative of KONIGSBERG's ("CC-2"), who had previously worked at Madoff Securities. For example, in a note dated April 14, 1992, CC-1 recorded a conversation she had with KONIGSBERG:

> Paul called
> Said [two particular investors] will be sending in additional $150,000— for their acct.
> They get 18% on that.
> [CC-2] gets 2% to be added to [CC-2's] pay ck.

30. Between approximately 1992 until the firm's collapse in December 2008, CC-2 was listed as an employee at Madoff Securities and was enrolled in the firm's health and 401(k) plans, despite not working at Madoff Securities. During that time period, therefore, CC-2

10

received more than approximately $320,000 in cash compensation on account of CC-2's "no show" job at Madoff Securities, plus health and retirement benefits to which CC-2 was not entitled.

31. Konigsberg Wolf filed CC-2's federal tax returns with the Internal Revenue Service. For example, CC-2's 2007 tax return listed CC-2's home address as "c/o Konigsberg [Wolf]," but identified CC-2 as an overseas resident on various Foreign Tax Credit forms, providing a foreign address. CC-2's tax returns listed "compensation" income from two sources: more than $800,000 in compensation from an overseas hedge fund, and approximately $22,200 in compensation from Madoff Securities.

## STATUTORY ALLEGATIONS

32. **The Conspiracy**. From at least in or about the early 1990s, up to and including on or about December 11, 2008, in the Southern District of New York and elsewhere, PAUL J. KONIGSBERG, the defendant, and others known and unknown, willfully and knowingly did combine, conspire, confederate and agree together and with each other to commit offenses against the United States, to wit, (a) falsifying the records of a broker-dealer, in violation of Title 15, United States Code, Sections 78q(a) and 78ff; and Title 17, Code of Federal Regulations, Section 240.17a-3; and (b) falsifying the records of an investment adviser, in violation of Title 15, United States Code, Sections 80b-4 and 80b-17; and Title 17, Code of Federal Regulations, Section 275.204-2.

### Objects of the Conspiracy

33. **Falsifying Records of a Broker-Dealer**. It was a part and an object of the conspiracy that PAUL J. KONIGSBERG, the defendant, and others known and unknown, willfully and knowingly, did cause Madoff Securities, a registered broker-dealer, to fail to make

11

and keep such records as the SEC, by rule, prescribed as necessary and appropriate in the public interest, for the protection of investors, and otherwise in furtherance of the purposes of the Securities Exchange Act of 1934, in violation of Title 15, United States Code, Sections 78q(a) and 78ff; and Title 17, Code of Federal Regulations, Section 240.17a-3.

34. **Falsifying Records of an Investment Adviser.** It was a further part and an object of the conspiracy that PAUL J. KONIGSBERG, the defendant, and others known and unknown, willfully and knowingly, by the use of the mails and means and instrumentalities of interstate commerce, in connection with Madoff Securities's business as an investment adviser, did cause Madoff Securities to fail to make and keep for prescribed periods such records, furnish such copies thereof and make and disseminate such reports as the SEC, by rule, prescribed as necessary and appropriate in the public interest and for the protection of investors, in violation of Title 15, United States Code, Sections 80b-4 and 80b-17; and Title 17, Code of Federal Regulations, Section 275.204-2.

### Means and Methods of the Conspiracy

35. Among the means and methods by which PAUL J. KONIGSBERG, the defendant, and others known and unknown, would and did carry out the conspiracy were the following:

   a. Madoff and others provided false and misleading information to the Madoff Securities investment advisory clients.

   b. Madoff directed certain investment advisory clients to use KONIGSBERG's accounting services.

   c. KONIGSBERG ensured that certain of his clients received their guaranteed returns, or other desired investment results, through back-dated trades.

### Overt Acts

36. In furtherance of the conspiracy and to effect the illegal objects thereof, PAUL J. KONIGSBERG, the defendant, and others known and unknown, committed the following overt acts, among others, in the Southern District of New York and elsewhere:

   a. In or about May 2003, KONIGSBERG approved the creation of back-dated trades in Client-2's investment advisory account.

   b. On or about December 10, 2008, CC-2, who was on the payroll at KONISBERG's instructions, was paid by Madoff Securities.

(Title 18, United States Code, Section 371.)

### COUNT TWO

### (Conspiracy to Commit ERISA Fraud)

The Grand Jury further charges:

37. The allegations contained in paragraphs 1 through 31 and 35 through 36 above are hereby repeated, realleged and incorporated by reference as if fully set forth herein.

### Statutory Allegations

38. **The Conspiracy.** From at least in or about 1992, through and including on or about December 11, 2008, in the Southern District of New York and elsewhere, PAUL J. KONIGSBERG, the defendant, and others known and unknown, knowingly did combine, conspire, confederate and agree together and with each other to commit offenses against the United States, to wit, falsifying statements in relation to documents required by ERISA, in violation of Title 18, United States Code, Sections 1027 and 2.

## Object of the Conspiracy

39. **False Statements in a document required by ERISA.** It was a part and an object of the conspiracy that PAUL J. KONIGSBERG, the defendant, and others known and unknown, knowingly, in documents required by Title I of ERISA to be published, kept as part of the records of employee welfare benefit plans and employee pension benefit plans, and certified to the administrator of such plan, did make and cause to be made false statements and representations of fact, knowing them to be false, and did knowingly conceal, cover up and fail to disclose facts the disclosure of which was required by Title I of ERISA, and was necessary to verify, explain, clarify, and check for accuracy and completeness reports required by such title to be published and information required by such title to be certified, in violation of Title 18, United States Code, Sections 1027 and 2.

## Means and Methods of the Conspiracy

40. Among the means and methods by which PAUL J. KONIGSBERG, the defendant, and others known and unknown, would and did carry out the conspiracy were the following:

   a. KONIGSBERG arranged a "no show" job for CC-2 at Madoff Securities.

   b. KONIGSBERG caused to be created false Madoff Securities documents reflecting an employee who in fact did not work at Madoff Securities so that the individual could fraudulently receive salary and benefits, and caused to be submitted to the United States Department of Labor fraudulent Forms 5500 that misrepresented the total number of Madoff Securities employees.

### Overt Act

41.  In furtherance of the conspiracy and to effect the illegal object thereof, PAUL J. KONIGSBERG, the defendant, and others known and unknown, committed the following overt act, among others, in the Southern District of New York and elsewhere:

   a. In or about 1992, in New York, New York, KONIGSBERG directed that CC-2 be placed on the Madoff Securities payroll.

(Title 18, United States Code, Section 371.)

### COUNT THREE

### (Falsifying Records of a Broker-Dealer)

The Grand Jury further charges:

42.  The allegations contained in paragraphs 1 through 31 and 35 through 36 above are hereby repeated, realleged and incorporated by reference as if fully set forth herein.

43.  Between in or about the early 1990s, and on or about December 11, 2008, PAUL J. KONIGSBERG, the defendant, willfully and knowingly, did cause Madoff Securities, a registered broker-dealer, to fail to make and keep such records as the SEC, by rule, prescribed as necessary and appropriate in the public interest, for the protection of investors, and otherwise in furtherance of the purposes of the Securities Exchange Act of 1934, to wit, KONIGSBERG, in connection with back-dated trades in investment advisory client accounts, caused false and fraudulent books and records, including, among other things, client account statements and trade confirmations, to be made and kept by Madoff Securities, a broker-dealer.

(Title 15, United States Code, Sections 78q(a) and 78ff;
Title 17, Code of Federal Regulations, Section 240.17a-3;
Title 18, United States Code, Section 2.)

## COUNT FOUR

### (Falsifying Records of an Investment Adviser)

The Grand Jury further charges:

44.     The allegations contained in paragraphs 1 through 31 and 35 through 36 above are hereby repeated, realleged and incorporated by reference as if fully set forth herein.

45.     Between in or about the early 1990s. and on or about December 11, 2008, in the Southern District of New York and elsewhere, PAUL J. KONIGSBERG, the defendant, willfully and knowingly, by the use of the mails and means and instrumentalities of interstate commerce, directly and indirectly, in connection with Madoff Securities's business as an investment adviser, did cause Madoff Securities to fail to make and keep for prescribed periods such records, furnish such copies thereof, and make and disseminate such reports as the SEC, by rule, prescribed as necessary and appropriate in the public interest and for the protection of investors, to wit, KONIGSBERG, in connection with back-dated trades in investment advisory client accounts, caused false and fraudulent books and records, including, among other things, client account statements and trade confirmations, to be made and kept by Madoff Securities, an investment adviser.

>               (Title 15, United States Code, Sections 80b-4 and 80b-17;
>               Title 17, Code of Federal Regulations, Section 275.204-2;
>                       Title 18, United States Code, Section 2.)

## COUNT FIVE

### (Falsifying Statements in Relation to Documents Required by ERISA)

The Grand Jury further charges:

46.     The allegations contained in paragraphs 1 through 31 and 35 through 36 are hereby repeated, realleged and incorporated by reference as if fully set forth herein.

16

47. From at least in or about 1992 through on or about December 11, 2008, in the Southern District of New York and elsewhere, PAUL J. KONIGSBERG, the defendant, knowingly, in documents required by Title I of ERISA to be published and kept as part of the records of employee welfare benefit plans and employee pension benefit plans, and certified to the administrator of such plans, made and caused to be made false statements and representations of fact, knowing them to be false, and knowingly concealed, covered up and failed to disclose facts the disclosure of which was required by Title I of ERISA, and was necessary to verify, explain, clarify, and check for accuracy and completeness reports required by such title to be published and information required by such title to be certified, to wit, KONIGSBERG caused to be submitted to the United States Department of Labor false documents reflecting an employee who in fact did not work at Madoff Securities.

(Title 18, United States Code, Sections 1027 and 2.)

## FORFEITURE ALLEGATION

### (Offenses Constituting Specified Unlawful Activity)

48. As the result of committing one, some, or all of the offenses constituting specified unlawful activity as defined in 18 U.S.C. § 1956(c)(7), as alleged in Counts One and Three of this Indictment, PAUL J. KONIGSBERG, the defendant, shall forfeit to the United States, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461, all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of the said offenses, including but not limited to a sum of money representing the amount of proceeds obtained as a result of the said offenses, and all property traceable thereto, for which the defendants are jointly and severally liable.

(Title 18, United States Code, Section 981(a)(1)(C),
and Title 28, United States Code, Section 2461.)

## Substitute Assets Provision

49. If any of the forfeitable property described above in paragraph 48 of this Indictment, as a result of any act or omission of the defendant:

    a. cannot be located upon the exercise of due diligence;

    b. has been transferred or sold to, or deposited with, a third person;

    c. has been placed beyond the jurisdiction of the Court;

    d. has been substantially diminished in value; or

    e. has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendant up to the value of the forfeitable property described above.

(Title 18, United States Code, Sections 981(a)(1)(C), 982(a)(2)(A);
Title 21, United States Code, Section 853(p);
and Title 28, United States Code, Section 2461.)

_____
FOREPERSON

_____
PREET BHARARA
United States Attorney