UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

- v. -

PAUL J. KONIGSBERG,

          Defendant.

**INFORMATION**

S12 10 Cr. 228 (LTS)

## COUNT ONE

**(Conspiracy to Falsify the Records of a Broker-Dealer, to Falsify the Records of an Investment Adviser, and to Obstruct and Impede the Due Administration of the Internal Revenue Laws)**

The United States Attorney charges:

### Relevant People and Entities

1. At all times relevant to this Information, Bernard L. Madoff Investment Securities LLC, and its predecessor, Bernard L. Madoff Investment Securities (collectively and separately, "Madoff Securities"), had its principal place of business in New York, New York. Madoff Securities operated three principal lines of business: market making, proprietary trading, and investment advisory. Madoff Securities was registered with the United States Securities and Exchange Commission ("SEC") as a broker-dealer since in or about 1960 and as an investment adviser since in or about August 2006. Madoff Securities also had a London-based affiliate, Madoff Securities International Ltd. ("Madoff International"), which engaged principally in proprietary trading.

2. Bernard L. Madoff ("Madoff") was the founder of Madoff Securities and its sole owner; Madoff also owned the majority of voting shares of Madoff International.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 6/24/14

3. In December 2008, Madoff Securities collapsed after its investment advisory business was revealed to be a massive fraud. While Madoff and certain of his co-conspirators had promised investors in Madoff Securities that their money would be invested in stocks, options, and other securities of well-known corporations, that money was in fact virtually never invested as promised. Instead, as described further below, the Madoff Securities investment advisory business operated as a massive Ponzi scheme in which some investors were paid with money "invested" by different investors, and other proceeds were used to personally benefit Madoff and the people around him. At the time of its collapse in December 2008, Madoff Securities maintained more than 4,000 investment advisory client accounts, which purported to have a combined balance of approximately $65 billion. In fact, Madoff Securities only had about $300 million in assets at the time.

4. PAUL J. KONIGSBERG, the defendant, was at all relevant times the senior tax partner with Konigsberg Wolf & Co., P.C. ("Konigsberg Wolf"), a certified public accounting firm located in New York, New York, that offered tax, accounting, and consulting services. In addition to being a licensed CPA, KONIGSBERG was a licensed attorney in New York State, and received a graduate legal degree in taxation. KONIGBSERG also held a small ownership interest in Madoff International, making him the only person outside of the Madoff family to hold an ownership interest in either Madoff Securities or Madoff International.

### The Ponzi Scheme

5. A "Ponzi scheme" is a particular type of financial fraud, in which an investment operation claims to pay returns to customers based on some promised investment strategy. In fact, however, in a Ponzi scheme, the perpetrator does not invest his client's money as promised; instead, one investor is paid from money "invested" by another.

2

6. For more than three decades, the Madoff Securities investment advisory business was a Ponzi scheme. From at least as early as the 1970s through Madoff's arrest on December 11, 2008, Madoff and certain employees of Madoff Securities perpetrated a scheme to defraud the investment advisory clients of Madoff Securities by accepting billions of dollars under false pretenses. They promised to invest clients' money in stocks, options, other securities, and financial instruments, and further promised that investors would achieve high rates of return with limited risk. But the investment advisory client funds were not being invested as promised. Instead, Madoff and certain of his co-conspirators misappropriated client money and converted it to their own use, whether by perpetuating the fraud or simply stealing it for their own use and the use of others.

7. In order to continue the fraud for so long, Madoff and certain employees of Madoff Securities created and disseminated bogus account statements to Madoff Securities investment advisory clients, which purported to show that their money had been invested, when in fact it virtually never was. In particular, beginning in the 1970s and until the early 1990s, Madoff and certain employees of Madoff Securities promised the bulk of the investment advisory clients that their money was invested in a so-called "convertible arbitrage" strategy, which involved paired trades of convertible securities and associated common stock. Beginning in the early 1990s, Madoff and certain employees of Madoff Securities claimed that they had switched, for the majority of investment advisory accounts, to a so-called "split-strike conversion" strategy, which involved the purchase of common stocks hedged by options. In addition, since at least the 1970s, certain Madoff Securities clients maintained investment advisory accounts that did not purport to run the convertible arbitrage or split-strike conversion strategies. Those client accounts appeared to enjoy particularly high rates of return (up to 45

3

percent per year, and sometimes more), whereas the majority of the investment advisory accounts appeared to generate rates of return closer to 10-17 percent.

8.  But regardless of whether a client's investment advisory account purported to run the convertible arbitrage strategy, the split-strike conversion strategy, or no particular strategy at all, the truth was that Madoff Securities — with very rare exception — was not making any trades at all. Instead, Madoff Securities investment advisory account statements were created by using historical price information, which Madoff and certain of his co-conspirators could manipulate to create whatever return (or, from time to time, loss) they desired.

9.  As a result of the actions of Madoff and his co-conspirators, the Madoff Securities Ponzi scheme lasted for well over thirty years, until it finally collapsed under its own weight.

### PAUL KONIGSBERG Participated In the Creation of False Books and Records at Madoff Securities

10. In order to keep his scheme hidden for so long, Madoff needed the assistance of certain willing outsiders that could be trusted to handle otherwise suspicious activity, even as those outsiders were not necessarily privy to all aspects of Madoff's massive fraud – even, most fundamentally, the fact that the Madoff Securities investment advisory business was a Ponzi scheme. In particular, Madoff directed certain of his investment advisory clients to use PAUL J. KONIGSBERG, the defendant, as their accountant – including some of Madoff's (although not necessarily KONIGSBERG's) most important customers, in whose accounts Madoff executed the most glaringly fraudulent transactions. By December 2008, the Konigsberg Wolf firm handled various accounting assignments in connection with more than approximately 300 of the Madoff Securities investment advisory accounts. KONIGSBERG typically received duplicate monthly investment advisory account statements for his customers. And at times, KONIGSBERG spoke with Madoff or other co-conspirators, including the co-heads of the

4

Madoff Securities investment advisory business, Frank DiPascali, Jr., and Annette Bongiorno, concerning the transaction activity in KONIGSBERG'S customers' accounts.

11. As part of his scheme, Madoff frequently guaranteed his clients a specific rate of return. For certain customers' accounts, Madoff or one of his co-conspirators executed special transactions that were not part of one of the firm's usual (fake) trading strategies (*e.g.*, convertible arbitrage or split-strike conversion) – which the Madoff Securities employees referred to as "schtup" trades – at the end of each year in order to meet the pre-determined return, or to pay some other agreed-upon compensation.

12. One of Madoff's long-time clients ("Client-1") – who had previously recruited other investors and so was entitled to an annual payment equivalent to approximately 1% of the money he brought into Madoff Securities – died in or about 1994. Although Madoff honored his promise to make the additional payments to Client-1's widow, Madoff encouraged her to use PAUL J. KONIGSBERG, the defendant, as her accountant. After Client-1's death, the monthly statements for the six investment advisory accounts Client-1 controlled went solely to Konigsberg Wolf.

13. In order to make the end-of-year payment easier to calculate, and to minimize the tax implications of the end-of-year "trades," Madoff and DiPascali employed a simplified investment "strategy" for the Client-1 accounts. Specifically, the Client-1 accounts were "invested" in United States Treasury bonds and cash equivalents for the first eleven months of the year, but DiPascali caused options trades – which are treated more beneficially for tax purposes than transactions in equity securities – to be "executed" in Client-1's account in December of each year in order to ensure the account achieved the guaranteed return. Over

several years, each December, PAUL J. KONIGSBERG, the defendant, spoke with DiPascali to ensure that Client-1's widow was receiving the promised funds.

14.     For example, Client-1's account statements for January through November 2003 reflect that Client-1's account was invested solely in U.S. Treasury bonds and money market funds, resulting in an approximate total account value of $860,000 at the end of November. In December 2003, however, Client-1's account reflected four options transactions (two buys and two sells) netting an additional approximately $825,000, which had the effect of nearly doubling the value of the account. The December 2003 options trades, moreover, were back-dated by DiPascali in Client-1's account, having been inputted into Madoff Securities' computers in January 2004. PAUL J. KONIGSBERG, the defendant, received Client-1's December 2003 account statement in or about January 2004, and used it to prepare Client-1's personal income tax return.

15.     For the majority of Madoff's clients, the fraudulent trading activity was back-dated within a single month, such as the options trades for Client-1's widow described above. For certain clients, however, Madoff and certain of his co-conspirators were able to create fake trades that were back-dated by many months in order to manipulate the returns in their accounts, sometimes for tax purposes.

16.     When that happened, Madoff Securities employees sometimes asked certain customers to return account statements to the firm, so that they could replace the original statements with "amended" ones reflecting new or different false trading activity. Madoff could ask this of only certain clients, since replacing a statement – sometimes one several months old – that reflected particular securities positions with "amended" statements reflecting entirely different positions, and resulting in entirely different account values, risked exposing the fraud.

6

17.     For example, in or about early 2003, Bongiorno created a year's worth of profitable, back-dated trades in the account of another Madoff Securities client ("Client-2"), who was also a client of PAUL J. KONIGSBERG, the defendant. Specifically, Client-2 suffered losses in a number of different investments in 2002, causing Client-2's net worth to decline dramatically. In order to restore Client-2's wealth, KONIGSBERG and Client-2 went to Bongiorno's office at Madoff Securities, and sat with her as she created and back-dated an entire years' worth of profitable securities transactions and corresponding account statements for Client-2's investment advisory account at Madoff Securities. Bongiorno then instructed KONIGSBERG and Client-2 to return the original statements before receiving the new, "amended" statements. Bongiorno's notes in connection with the amended statements read, "Do not send corrected statements until we get Paul & [Client-2's] copies." KONIGSBERG then prepared Client-2's tax returns based on the "amended" statements, rather than the statements that Client-2 (and KONIGSBERG, as Client-2's accountant) had received in the ordinary course of Madoff Securities's business.

18.     Likewise, in or about 2008, Bongiorno created "amended" statements for another investment advisory client of Madoff Securities ("Client-3"), who used the accounting services of PAUL J. KONIGSBERG, the defendant. In or about August 2008, KONIGSBERG was present for a conversation between Madoff and Client-3, in which Madoff stated that he would no longer support Client-3 financially. Specifically, Client-3 owed Madoff approximately $1.6 million, and unbeknownst to KONIGSBERG at the time, Madoff planned to recoup that money by back-dating trades in Client-3's account. In order to accomplish that goal, both Client-3 and KONIGBSERG, who received duplicate account statements, needed to return the original statements first. And in fact, the original statements – crossed-out to reflect that they were no

7

longer current – were returned to Bongiorno. A note on the original February 2008 statement stated, "Rec. only Paul's copy. <u>Not</u> [Client-3's] copy of 2/29/08." A similar post-it note was on the original, crossed-out April 2008 statement. And another note made by Bongiorno read:

> <u>Corrected statements</u>
> Keep in hanging folder.
> <u>Do not mail out!</u>
> We never received his original statement back (from [Client-3])
> He told Bernie he sends everything to Paul &
> Paul told Bernie he shreds whatever he doesn't need!

### **KONIGSBERG Arranges a No-Show Job**

19. In or about 1992, after a different accounting firm that bundled client funds for investment in Madoff Securities was shut down by the SEC, Madoff required the various other "bundlers" to have their clients invest directly in Madoff Securities, rather than going through an intermediary. At the same time, Madoff offered to make an annual cash payment to the "bundlers," determined as a percentage of funds attributable to that "bundler's" investors. For example, as discussed above, Madoff agreed to pay Client-1 1% of the money Client-1's investors deposited at Madoff Securities.

20. At the same time, Madoff offered PAUL J. KONISBERG, the defendant, an additional cash payment of approximately $20,000 per year. KONIGSBERG instructed Madoff to pay a relative of KONIGSBERG's ("Relative-1"), who had previously worked at Madoff Securities. For example, in a note dated April 14, 1992, Bongiorno recorded a conversation she had with KONIGSBERG:

> Paul called
> Said [two particular investors] will be sending in additional
> $150,000— for their acct.
> They get 18% on that.
> [Relative-1] gets 2% to be added to [Relative-1's] pay ck.

8

21.     Between approximately 1992 until the firm's collapse in December 2008, Relative-1 was listed as an employee at Madoff Securities and was enrolled in the firm's employee benefits plans, despite not working at Madoff Securities. During that time period, therefore, Relative-1 received more than approximately $320,000 in cash compensation on account of Relative-1's "no show" job at Madoff Securities, plus employee benefits to which Relative-1 was not entitled.

22.     Konigsberg Wolf filed Relative-1's federal tax returns with the Internal Revenue Service, which falsely listed approximately $22,200 in annual compensation from Madoff Securities.

### KONIGSBERG Advises MADOFF and His Family About Their Personal Taxes

23.     Although he did not prepare Madoff's taxes, PAUL J. KONGISBERG, the defendant, also provided tax and business advice to Madoff personally. For example, Madoff consulted KONIGSBERG about establishing Madoff Securities, which had for years been a sole proprietorship, as a Limited Liability Company. Madoff also consulted KONIGSBERG concerning accounting and bookkeeping issues in connection with Madoff International, the firm's London affiliate.

24.     In or about the early 1990s, Madoff consulted KONIGSBERG about the tax consequences of transferring funds to two other employees of Madoff Securities ("CC-1" and "CC-2"). KONIGSBERG advised Madoff that if the transfers were structured as loans and if CC-1 and CC-2 paid interest on those loans and paid back the principal of the loans, no taxes would be due and owing by either Madoff or by CC-1 or CC-2. Thereafter, KONIGSBERG arranged for a lawyer he worked with to draft promissory notes documenting the loans, and KONIGSBERG provided some of the financial terms of the loans, such as the applicable interest

9

rate. The promissory notes therefore appeared to conform to the tax law, as Madoff, CC-1, and CC-2 desired.

25.  In fact, however, the transfers were not loans at all, and, with rare exception, CC-1 and CC-2 neither made interest payments nor repaid the principal when it came due. For example, a "financial update" from CC-1 to Madoff dated October 19, 1995, lists various of CC-1's assets and liabilities. Under the heading "Promissory Note," CC-1 wrote:

> I have a promissory note with you that is for $600,000 at a 7% rate for three years. I am supposed to pay you interest each year of $42,000. Paul told me that the concept was to pay the interest for three years and then forget about the principal after December 2, 1997.

26.  In total, between in or about 1995 and in or about 2008, Madoff transferred well more than approximately $20 million to each of CC-1 and CC-2 through these "loans," which resulted in the payment of no additional taxes by Madoff, CC-1, or CC-2.

27.  On December 10, 2008, however – the day before Madoff was arrested – Madoff called PAUL J. KONIGSBERG, the defendant, to ask whether the loans had been converted into gifts, which would have created a substantial tax liability for Madoff. In fact, Madoff and KONIGSBERG had never discussed the possibility of reclassifying the loans into gifts, and KONIGSBERG told Madoff so.

28.  Previously, in or about 2002, PAUL J. KONGISBERG, the defendant, Bernard Madoff, Peter Madoff, CC-1, CC-2, and another person became partners in a real estate acquisition. After the property increased in value, KONIGSBERG participated in a plan to donate the real estate to charity as part of a bona fide tax reduction strategy. CC-1 and CC-2, however, did not have sufficient adjusted gross income to take full advantage of the resulting charitable deduction.

10

29.     In late March 2002, however, Bongiorno entered fictitious trades that were back-dated by over a year in CC-1 and CC-2s's account in order to generate sufficient income so as to take advantage of the charitable contribution referenced in paragraph 28, above. Specifically, and unbeknownst to PAUL J. KONIGSBERG, the defendant, Bongiorno back-dated a buy to January 2001 and a sell to January 2002 in each of their accounts, resulting in a paper profit of more than $5.3 million for each of CC-1 and CC-2. When CC-1 and CC-2 withdrew those funds and realized the gain, their adjusted gross income was such that they were then able to take full advantage in that year of the more than $2 million charitable deduction (per person) created by the donation of the real estate that CC-1 and CC-2 had invested in with KONIGSBERG and others, and CC-1 and CC-2 received substantial tax refunds.

## STATUTORY ALLEGATIONS

30.     **The Conspiracy.** From at least in or about the early 1990s, up to and including on or about December 11, 2008, in the Southern District of New York and elsewhere, PAUL J. KONIGSBERG, the defendant, and others known and unknown, willfully and knowingly did combine, conspire, confederate and agree together and with each other (1) to commit offenses against the United States, to wit, (a) falsifying the records of a broker-dealer, in violation of Title 15, United States Code, Sections 78q(a) and 78ff; and Title 17, Code of Federal Regulations, Section 240.17a-3; (b) falsifying the records of an investment adviser, in violation of Title 15, United States Code, Sections 80b-4 and 80b-17; and Title 17, Code of Federal Regulations, Section 275.204-2; and (2) to defraud the United States for the purpose of impeding, impairing, obstructing, and defeating the lawful government function of the Internal Revenue Service in the ascertainment, assessment, computation and collection of the revenue, to wit, income taxes.

## **Objects of the Conspiracy**

31. **Falsifying Records of a Broker-Dealer.** It was a part and an object of the conspiracy that PAUL J. KONIGSBERG, the defendant, and others known and unknown, willfully and knowingly, did cause Madoff Securities, a registered broker-dealer, to fail to make and keep such records as the SEC, by rule, prescribed as necessary and appropriate in the public interest, for the protection of investors, and otherwise in furtherance of the purposes of the Securities Exchange Act of 1934, in violation of Title 15, United States Code, Sections 78q(a) and 78ff; and Title 17, Code of Federal Regulations, Section 240.17a-3.

32. **Falsifying Records of an Investment Adviser.** It was a further part and an object of the conspiracy that PAUL J. KONIGSBERG, the defendant, and others known and unknown, willfully and knowingly, by the use of the mails and means and instrumentalities of interstate commerce, in connection with Madoff Securities's business as an investment adviser, did cause Madoff Securities to fail to make and keep for prescribed periods such records, furnish such copies thereof and make and disseminate such reports as the SEC, by rule, prescribed as necessary and appropriate in the public interest and for the protection of investors, in violation of Title 15, United States Code, Sections 80b-4 and 80b-17; and Title 17, Code of Federal Regulations, Section 275.204-2.

33. **Impairing the Lawful Function of the IRS.** It was a further part and an object of the conspiracy that PAUL J. KONIGSBERG, the defendant, and others known and unknown, willfully and knowingly would and did defraud the United States of America, and an agency thereof, to wit, the Internal Revenue Service, by impeding, impairing, obstructing, and defeating the lawful government functions of the Internal Revenue Service in the ascertainment, assessment, computation and collection of income taxes.

## Means and Methods of the Conspiracy

34. Among the means and methods by which PAUL J. KONIGSBERG, the defendant, and others known and unknown, would and did carry out the conspiracy were the following:

   a. Madoff and others provided false and misleading information to the Madoff Securities investment advisory clients.

   b. Madoff directed certain investment advisory clients to use KONIGSBERG's accounting services.

   c. KONIGSBERG filed tax returns on behalf of certain Madoff Securities investment advisory clients based on the activity reflected in "amended" account statements, which reflected transactions that did not exist in the Madoff Securities ordinary-course books and records.

   d. KONIGSBERG participated in a bona fide tax reduction strategy that permitted Madoff, CC-1, and CC-2 to take advantage of false, back-dated trades through charitable deductions.

## Overt Acts

35. In furtherance of the conspiracy and to effect the illegal objects thereof, PAUL J. KONIGSBERG, the defendant, and others known and unknown, committed the following overt acts, among others, in the Southern District of New York and elsewhere:

   a. In or about early 2003, Annette Bongiorno, in the presence of KONIGSBERG and Client-2, created and back-dated an entire year's worth of securities transactions and account statements for Client-2's investment advisory account at Madoff Securities.

13

    b. On or about December 10, 2008, Relative-1, who was on the payroll at KONISBERG's instructions, was paid by Madoff Securities.

(Title 18, United States Code, Section 371.)

## COUNT TWO

### (Falsifying Records of a Broker-Dealer)

The United States Attorney further charges:

36.     The allegations contained in paragraphs 1 through 29 and 34 through 35 above are hereby repeated, realleged and incorporated by reference as if fully set forth herein.

37.     Between in or about the early 1990s, and on or about December 11, 2008, PAUL J. KONIGSBERG, the defendant, willfully and knowingly, did cause Madoff Securities, a registered broker-dealer, to fail to make and keep such records as the SEC, by rule, prescribed as necessary and appropriate in the public interest, for the protection of investors, and otherwise in furtherance of the purposes of the Securities Exchange Act of 1934, to wit, KONIGSBERG caused false and fraudulent books and records, including, among other things, client account statements and trade confirmations in connection with back-dated trades in investment advisory client accounts, as well as false and fraudulent employment records, to be made and kept by Madoff Securities, a broker-dealer.

(Title 15, United States Code, Sections 78q(a) and 78ff;
Title 17, Code of Federal Regulations, Section 240.17a-3;
Title 18, United States Code, Section 2.)

14

## COUNT THREE

### (Falsifying Records of an Investment Adviser)

The United States Attorney further charges:

38. The allegations contained in paragraphs 1 through 29 and 34 through 35 above are hereby repeated, realleged and incorporated by reference as if fully set forth herein.

39. Between in or about the early 1990s, and on or about December 11, 2008, in the Southern District of New York and elsewhere, PAUL J. KONIGSBERG, the defendant, willfully and knowingly, by the use of the mails and means and instrumentalities of interstate commerce, directly and indirectly, in connection with Madoff Securities's business as an investment adviser, did cause Madoff Securities to fail to make and keep for prescribed periods such records, furnish such copies thereof, and make and disseminate such reports as the SEC, by rule, prescribed as necessary and appropriate in the public interest and for the protection of investors, to wit, KONIGSBERG caused false and fraudulent books and records, including, among other things, client account statements and trade confirmations in connection with back-dated trades in investment advisory client accounts, as well as false and fraudulent employment records, to be made and kept by Madoff Securities, an investment adviser.

(Title 15, United States Code, Sections 80b-4 and 80b-17;
Title 17, Code of Federal Regulations, Section 275.204-2;
Title 18, United States Code, Section 2.)

## FORFEITURE ALLEGATION

### (Offenses Constituting Specified Unlawful Activity)

40. As the result of committing the offenses constituting specified unlawful activity as defined in 18 U.S.C. § 1956(c)(7), as alleged in Counts One and Two of this Information, PAUL J. KONIGSBERG, the defendant, shall forfeit to the United States, pursuant to 18 U.S.C.

§ 981(a)(1)(C) and 28 U.S.C. § 2461, all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of the said offenses, including but not limited to a sum of money representing the amount of proceeds obtained as a result of the said offenses, and all property traceable thereto, for which the defendants are jointly and severally liable.

(Title 18, United States Code, Section 981(a)(1)(C),
and Title 28, United States Code, Section 2461.)

### Substitute Assets Provision

41.   If any of the forfeitable property described above in paragraph 40 of this Information, as a result of any act or omission of the defendant:

   a. cannot be located upon the exercise of due diligence;

   b. has been transferred or sold to, or deposited with, a third person;

   c. has been placed beyond the jurisdiction of the Court;

   d. has been substantially diminished in value; or

   e. has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendant up to the value of the forfeitable property described above.

(Title 18, United States Code, Sections 981(a)(1)(C), 982(a)(2)(A);
Title 21, United States Code, Section 853(p);
and Title 28, United States Code, Section 2461.)

*Preet Bharara*
PREET BHARARA
United States Attorney

Form No. USA-33s-274 (Ed. 9-25-58)

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

- v -

PAUL J. KONIGSBERG,

Defendant.

### INFORMATION

S12 10 Cr. 228 (LTS)

15 U.S.C. §§ 78q(a), 78ff, 80b-4, and 80b-17;
Title 17, Code of Federal Regulations,
Sections 240.17a-3 and 275.204-2; and
18 U.S.C. §§ 371 and 2.

PREET BHARARA
United States Attorney.