UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

v.

No. S12 10 Cr. 228 (LTS)

PAUL J. KONIGSBERG,

Defendant.

**SENTENCING MEMORANDUM ON BEHALF OF
PAUL J. KONIGSBERG**

July 1, 2015

GIBSON, DUNN & CRUTCHER LLP

Reed Brodsky
Darcy C. Harris
200 Park Avenue
New York, N.Y.  10166
Tel:  (212) 351-4000
Fax:  (212) 351-4035

*Attorneys for Defendant Paul J. Konigsberg*

# TABLE OF CONTENTS

Page

I. PRELIMINARY STATEMENT ............................................................................. 1

II. MR. KONIGSBERG'S PERSONAL BACKGROUND AND CHARACTER ...................... 2

    A.    Early Life ............................................................................................. 2

    B.    Education and Early Charitable Activities ............................................. 3

    C.    Military Service ................................................................................... 5

    D.    Early Family ........................................................................................ 5

    E.    Later Family ........................................................................................ 6

    F.    Mr. Konigsberg's Career .................................................................... 10

    G.    Community Involvement ..................................................................... 18

    H.    Humanitarianism ............................................................................... 22

        1.    UJA-Federation of New York ................................................... 23

        2.    Support for Israel During its Military Conflicts ......................... 25

        3.    Albert Einstein College of Medicine of Yeshiva University ............... 26

        4.    The Jewish Foundation for the Righteous ................................. 28

        5.    West Side Jewish Community Center .......................................... 28

        6.    Auschwitz Jewish Center Foundation ....................................... 29

        7.    Gift of Life Bone Marrow Foundation ....................................... 29

        8.    New York Board of Rabbis ........................................................ 29

        9.    Selfhelp Community Services .................................................... 30

        10.    Ohr Somayach ......................................................................... 31

        11.    Washington Institute for Near East Policy ................................ 31

        12.    Jewish Federation of Palm Beach County .................................. 32

        13.    Inspiration to Others ................................................................ 32

III. THE NATURE AND CIRCUMSTANCES OF THE OFFENSE ........................................ 33

**TABLE OF CONTENTS**
**(continued)**

Page

IV.  A NON-GUIDELINES SENTENCE OF TIME SERVED IS APPROPRIATE .................. 37

    A.     The Factors in 18 U.S.C. § 3553(a) Support a Sentence of Time Served ................. 38

        1.     The Nature and Circumstances of the Offense and the History and
               Characteristics of the Defendant............................................................ 39

        2.     The Need for the Sentence Imposed to Reflect the Seriousness of the
               Offense, to Promote Respect for the Law, to Provide Just Punishment for
               the Offense, and to Afford Adequate Deterrence to Criminal Conduct .............. 43

        3.     The Need for the Sentence Imposed to Provide the Defendant with Needed
               Medical Care in the Most Effective Manner......................................... 46

        4.     The Need to Avoid Unwarranted Sentence Disparities Among Defendants
               with Similar Records Who Have Been Found Guilty of Similar Conduct .......... 47

        5.     The Need to Provide Restitution to Any Victims of the Offense ........................ 48

    B.     Mr. Konigsberg's Cooperation Warrants a Significant Departure from the
           Guidelines ................................................................................................. 48

CONCLUSION............................................................................................................ 50

# TABLE OF AUTHORITIES

Page

## Cases

*Gall v. United States*,
    552 U.S. 38 (2007)..................................................................................... 38

*Kimbrough v. United States*,
    552 U.S. 85 (2007)..................................................................................... 38

*Pepper v. United States*,
    562 U.S. 476 (2011)................................................................................... 38

*United States v. Adelson*,
    441 F. Supp. 2d 506 (S.D.N.Y. 2006)...................................................... 40

*United States v. Booker*,
    543 U.S. 220 (2005)................................................................................... 38

*United States v. Feeny,*
    No. 00 Cr. 91-09, 2002 WL 31426024 (S.D.N.Y. Oct. 28, 2002)........................... 47

*United States v. Jones*,
    531 F.3d 163 (2d Cir. 2008)...................................................................... 38

*United States v. Senesey*,
    No. 94 Cr. 290-01, 1997 WL 187345 (Apr. 15, 1997) ...................................... 47, 48

*United States v. Stewart*,
    590 F.3d 93 (2d Cir. 2009)........................................................................ 46

*United States v. Studley*,
    47 F.3d 569 (2d Cir. 1995)................................................................... 36, 37

*Williams v. New York*,
    337 U.S. 241 (1949)................................................................................... 38

## Statutes

18 U.S.C. § 3553(a) ...................................................................... 38, 39, 42, 47

## Other Authorities

United States Sentencing Commission, *Guidelines Manual*, § 1B1.3 (Nov. 2014) ................... 37

United States Sentencing Commission, *Guidelines Manual*, § 5H1.1 (Nov. 2014).................. 46

United States Sentencing Commission, *Guidelines Manual*, § 5K1.1(a) (Nov. 2014) .............. 49

**TABLE OF AUTHORITIES**
**(continued)**

Page

United States Sentencing Commission, *Guidelines Manual*,
  Commentary to § 1B1.3, n.2 (Nov. 2014) ............................................................... 37

United States Sentencing Commission, *Guidelines Manual*,
  Commentary to § 2B1.1, n.3(A)(i), (iv) (Nov. 2014) ............................................... 37

United States Sentencing Commission, *Guidelines Manual*,
  Commentary to USSG § 5K1.1, n.3 (Nov. 2014) .................................................... 50

We represent Paul J. Konigsberg, a 79-year old man who has dedicated his life to assisting others, and who has accepted responsibility for what he did wrong and cooperated with the government.  In advance of sentencing on or about July 9, 2015, we respectfully submit this Sentencing Memorandum for the Court's consideration.  In light of the nature and circumstances of Mr. Konigsberg's offense, Mr. Konigsberg's lifelong, selfless dedication to helping others which overwhelmingly represents his character, and the other factors set forth below, we respectfully ask the Court to sentence Mr. Konigsberg, as recommended by the Probation Office, to time served.  We also respectfully ask the Court not to impose any fine and not to impose any further term of supervised release.

## I.  PRELIMINARY STATEMENT

Mr. Konigsberg's conduct in this case is truly an aberration in a long life that, as many will attest, he has otherwise led with honesty, impeccable character, and a deep commitment to the well-being of others.  This is not offered as an excuse, but rather to explain that the events of this case are highly uncharacteristic of the man that Mr. Konigsberg has been and is today. Although it must be said at the outset that Mr. Konigsberg had no knowledge that Bernard Madoff ("Madoff") was a diabolical monster masking himself in the clothing of a self-made billionaire and leader in the securities industry with the highest standards of integrity, Mr. Konigsberg will forever live with the stigma and shame of being associated with this terrible fraud, and the horrible consequences of that association for his family, friends, and loved ones. While it took Mr. Konigsberg time to come to grips with his responsibility for agreeing with people at Bernard L. Madoff Investment Securities LLC ("Madoff Securities") and certain of Madoff's clients to return certain account statements to Madoff Securities and accept amended statements with different securities transactions, Mr. Konigsberg has accepted full responsibility

for his error in judgment, and he has cooperated with the government, providing, according to the government, "valuable assistance . . . on a variety of fronts."

As the 80 letters submitted to the Court with this memorandum describe in detail, Mr. Konigsberg has always been remarkably selfless and generous—with his time, money, and guidance, and without expectation of anything in return.  Letters have been submitted by his children, wife, ex-wife, brothers, and extended family; childhood friends and classmates; business clients, colleagues, and employees; educational, philanthropic, and spiritual leaders; and numerous people to whom, over the course of his seventy-nine years, he has provided compassionate camaraderie, advice, and/or assistance—young and old, rich and poor, from many different walks of life.  These letters paint the true portrait of Mr. Konigsberg—a man whose "family" includes his entire community.  Throughout his life, Mr. Konigsberg has treated all his employees, business associates, clients, family friends, neighbors, and even his longtime barber, like members of Mr. Konigsberg's extended family—loving, protecting, championing, and supporting them.  And it pains Mr. Konigsberg that he has let them all down.

When the nature of Mr. Konigsberg's crime, his personal history and characteristics, and the requirement that his sentence be sufficient, but not greater than necessary to comply with the purposes set forth in 18 U.S.C. § 3553(a)(2) are taken into account, we respectfully submit that a sentence of time served with no fine and no further term of supervised release is warranted and appropriate in this case.

## II.  MR. KONIGSBERG'S PERSONAL BACKGROUND AND CHARACTER

### A.  Early Life

Paul Konigsberg was born in Brooklyn, New York, in 1936.  He was the oldest of three boys, and served as a mentor and role model for his younger brothers Robert and Frederic.  His father, an accountant, instilled in the Konigsberg boys "the qualities of honesty, integrity, and

caring for others."  (Robert Konigsberg.)[1]  His mother, a homemaker, also taught them that, if able, they should always give back to those less fortunate.  Mr. Konigsberg took this to heart, and began volunteering in earnest in college—a practice that he still maintains to this day, despite many setbacks associated with his guilty plea in this case.

## B.   Education and Early Charitable Activities

Mr. Konigsberg grew up in Brooklyn, New York, and graduated from James Madison High School in 1954.  He then attended the University of Vermont for two years before transferring to New York University, where he graduated in 1958 with a Bachelor of Business Administration degree.

Mr. Konigsberg's time at the University of Vermont ("UVM") had a profound impact on him—in particular, Professor Raul Hilberg, who authored "the first comprehensive three-volume study of the Holocaust (*The Destruction of the European Jews*, first published in 1961)." (Kathleen Kelleher.)  Mr. Konigsberg's son would later attend and graduate from UVM, and in 1990, Mr. Konigsberg learned that Professor Hilberg was retiring.  As Kathleen Kelleher, Vice President of the UVM Foundation, explains, Mr. Konigsberg quickly volunteered to "spearhead fundraising efforts to organize an international symposium on the Holocaust in honor of Professor Hilberg. . . . Because of his support and enthusiasm, several faculty members at UVM also began to work toward the goal of establishing a program in Holocaust Studies that would continue beyond Professor Hilberg's retirement."  After Mr. Konigsberg's "extraordinary" efforts as the "lead volunteer" organizing the symposium in honor of Professor Hilberg, Mr. Konigsberg worked with UVM to create a formal Center for Holocaust Studies at the school

---

[1]   Unless otherwise noted, citations to an individual's name refer to the letter in support of Mr. Konigsberg authored by that individual.  All 80 letters in support of Mr. Konigsberg are provided in the Appendix attached to this Sentencing Memorandum.

(http://www.uvm.edu/~uvmchs/); he then went on to establish the Richard Ader/Paul Konigsberg Endowment for the UVM Center for Holocaust Studies, which "provide[s] financial support [for the Center] in perpetuity."  (Kathleen Kelleher.)

While Mr. Konigsberg was in college at New York University, he began volunteering for the Boro Park YMHA (http://www.boroparky.org/), where his father served as president.  Mr. Konigsberg worked with this organization, which serves the communities of Boro Park and Flatbush, to provide programs geared toward the needs of the community, such as Club Nissim, a social club for Holocaust survivors, fitness programs, and activities for children and adults.  In addition to interacting with children and the elderly in his community to enrich and better their lives, Mr. Konigsberg went on to serve as a member of Boro Park YMHA's Board.

After college, Mr. Konigsberg attended law school at Brooklyn Law School in 1958, graduating with his J.D. in 1961.  He then pursued an L.L.M. in tax at the New York University School of Law, graduating in 1966.  During this time, Mr. Konigsberg became involved with Sponsors for Educational Opportunity (http://www.seo-usa.org/), a non-profit organization founded in 1963 by one of Mr. Konigsberg's friends as a mentoring program to help underserved students get into what were then largely Caucasian, private colleges and universities.  Mr. Konigsberg volunteered for this organization for over twenty-five years, and served as a member of its Board.  He mentored many students in this program over the years—many of them African-American men with difficult backgrounds—providing advice, guidance, and support that led to admission in colleges all over the country.  Many of these individuals went on to establish successful careers in medicine, law, investment banking, and accounting, to name a few, and many came back to Sponsors for Educational Opportunity to help the next generation of children struggling to rise above their own challenging circumstances.

4

### C.   Military Service

In 1962, at the same time that he decided to pursue his L.L.M. degree, Mr. Konigsberg enlisted in the United States Army.  He served for six months, and then joined the Army Reserves.  For the next six years, Mr. Konigsberg reported for service for two weeks each summer.  Although he was prepared to serve his country, he was never stationed outside the United States, and never saw active combat; in 1968, he was honorably discharged.

### D.   Early Family

During this same time period, Mr. Konigsberg married his first wife, Gloria.  They were married on May 9, 1964, and later had two children—Stephen and Jeffrey.  As Gloria describes it, "Paul did the very best that he could, 'even changing diapers[.]'  [A]s the children grew he participated in all parental activities even coaching a winning Little League Team."  (Gloria Konigsberg.)  Mr. Konigsberg was—and is—"an extremely devoted family man and father." (Louis Sheinbaum.)  As Jeffrey Konigsberg's former girlfriend and close friend, Rachel Clark, described it:

> I know Jeff is a reflection of his father's values.  Jeff is an artist and educator, dedicated to working with children.  In this respect, he and his father lead very different lives, but Paul has always supported and taken pride in his son's career. Through some difficult times, he has supported Jeff, both emotionally, and at times, financially.

(Rachel Clark.)  Mr. Konigsberg's son, Jeffrey, likewise noted that "even though it was a world completely foreign to him, my father supported my dreams to be an artist and to teach art to public school children."  (Jeffrey Konigsberg.)

Mr. Konigsberg's friend since childhood, Richard Leder, similarly observed that "Paul has been a wonderful, supportive, caring father to his boys, Stephen and Jeffrey."  His employees likewise knew "of his strong sense of the importance [of] family as he led by example."  (Paula Iacovissi.)  Stephen Krass admired "the love and devotion Paul has given to his family," noting

"Paul has always been there for them."  And Lawrence Bass "know[s] of no one who does not admire the family that he has built, sustained, and loves."

## E.    Later Family

Although Mr. Konigsberg and Gloria grew apart and divorced in or about 1983, they have stayed in contact, and "as an ex-husband, Paul honored and supported my position." (Gloria Konigsberg.)  In addition, since their separation and later divorce—and to this day—Mr. Konigsberg "has continued to provide [Gloria] with financial assistance which is far more than [their] divorce decree required."  (Gloria Konigsberg.)

At or around the time that Mr. Konigsberg and Gloria got divorced, Mr. Konigsberg met his future wife, Judy, through mutual friends.  As Judy explains, Mr. Konigsberg quickly embraced her children from a prior marriage, creating a new, modern family that was loving and accepting of everyone:

> We met thirty-three years ago through mutual friends when I was a divorced, working woman with two young children.  Neither Paul nor I had much of anything back then. . . . Paul owned a tennis racket, a shopping bag filled with family photos, and a prayer shawl.  I fell for Paul because he was kind, humble, and considerate to my children.  Most of the men I dated tended to ignore them. Paul not only had conversations with them but also included them in everything we did together.  His genuine persona and integrity were evident from the very beginning of our relationship.

(Judith Konigsberg.)

In 1985, Mr. Konigsberg and Judy got married.  Judy's ex-husband, who admittedly had a "strained" relationship with his ex-wife at the time, was impressed by Mr. Konigsberg's "decency and kindness," his "character, his sensibilities[,] and his values."  (Michael Feiner.)

> Paul was always caring for Matthew and Allison, who were 16 and 13 when he and Judy married.  In the ensuing years, Paul has been a kind and exemplary role model; he never tried to replace me as a father and never disparaged my character or persona. . . . He has made an effort to always do right by me and our family, and I ask you to take a lifetime of his decency and kindness into consideration.

*Id.*  Judy's children have confirmed that Mr. Konigsberg quickly became a second father to them,

rather than a stepfather, loving them unconditionally and offering himself as a role model and

source of parental guidance and support:

> Paul has been much more than a step father to me.  He has always introduced me
> to people as his daughter, which I interpreted not only as a sign of pride and love
> for me but also his joy in finally having a girl in the family. . . . While my own
> father has been deeply involved in all aspects of my life, I was granted a second
> father in Paul - a man I love, respect and admire. . . .
>
> [W]hat most people can't attest to first-hand and is far more important to me is
> the way Paul changed our family.  As a young kid who had been through the
> upheaval of my parents' divorce, I worried about many things but when Paul
> joined our family, he immediately provided a feeling of safety that's difficult to
> describe.  He made my mom happy after she had been single for years.  He
> showed interest in me in ways that her other boyfriends never did -- asking
> questions, offering advice, and providing lots of comic relief.  He treated my
> brother and me with acute sensitivity to the fact that we already had a father.  Paul
> never raised his voice, showing incredible patience with two step children who
> were less than respectful at times.  While pulled in many different directions as a
> business owner, active volunteer for many charities, and trusted advisor to friends
> and employees, Paul has never missed a holiday, birthday, graduation or any other
> important event in our family.  He always encouraged me to pursue my religious
> studies, to work hard in school, and to make good decisions about my friends,
> relationships, and career.

(Allison Feldman.)

> From the moment I met Paul, he provided a high level of stability and
> understanding to a unique and somewhat turbulent joint custody arrangement
> between my mother and father.  I take a great deal of pride in my relationship
> with Paul, mostly because the kind of guy Paul is and how positive a force he has
> been in my life. . . .
>
> From the moment I entered the "real world", Paul strongly suggested that I strive
> to contribute 10+% of my net pay to charity.  There have been times in my life
> where I contemplated a short cut or doing something dishonest, and Paul has
> always pointed me in the right direction.  Paul truly has been a role model for me
> in so many ways.

(Matthew Feiner.)  Others have similarly commented on the strong, loving family that Mr.

Konigsberg and Judy built together:  "Sandy and I observed how loving and generous he was—

and is—to his wife's Judy's children from a prior marriage.  Not only was Paul a kind, wise

father to his own children, he treated Judy's in the same loving manner.  In turn, they consider

him a father, and not a stepfather."  (Lawrence Bass.)  "Paul has been a very caring father of two

sons, Steven and Jeffrey and his wife, Judy and her two children, Matthew and Allison."

(Herbert Corbin.)

> To Paul, there was no such thing as a "step" daughter.  He embraced Allison fully
> as the daughter he never had, putting her picture up in his office, cheering her on
> at her softball games, and bragging about her to anyone who would listen. . . .
>
> I know that for Allison, Paul has been a parent in every way that matters.  He is
> there for her unconditionally, supporting her through all of life's ups and downs,
> and always prioritizing her happiness and the happiness of her daughter, [M.F.].

(Laura Rebell Gross.)

At the same time, Mr. Konigsberg continued to love, support, and provide for his sons

from his first marriage as well.  Mr. Konigsberg:

> [P]aid for my secondary education, including my graduate degree in art education,
> and helped support me both financially and emotionally as I attempted to juggle a
> dual career along with living life in New York City.  I now work full time
> teaching art to kids.  I teach 560 kids a week at two schools in Massachusetts, I
> have a Masters degree, and am well respected in my field.  Over the past 22 years
> I've taught art to 11,000+ city kids, and they love my classes (mostly!).  In
> addition, I have shown my artwork [in] numerous galleries and museums.  I
> couldn't have achieved any of this without my father[']s support.

(Jeffrey Konigsberg.)

As many of the letters written in support of Mr. Konigsberg demonstrate, his love and

devotion extended not only to his children and stepchildren, but to their friends and family as

well.  Mr. Konigsberg's stepdaughter's best friend wrote that:

> As [Allison's] best friend, I was embraced too.  Paul was an adult in my life who
> believed in me. . . he listened to me, came to my plays, encouraged me to write
> and, eventually, counseled me on where to go to apply to college and what to
> study. . . . As a struggling teacher in my first job, Paul helped me develop my first
> budget, patiently going through each line with me. . . . Years later, when I
> founded a charter school for inner city girls, Paul wrote me a beautiful letter about
> the value of my work and donated generously to the school. . . . At so many of
> life's milestones: from my college graduation to my wedding to the naming

ceremony for my first child, I [have] looked up and seen Paul smiling proudly.

(Laura Rebell Gross.)  Mr. Konigsberg's son's former girlfriend similarly shared her inclusion in

the Konigsberg family, and the joy and kindness Mr. Konigsberg shares with all those who are

included in their family gatherings:

> I have been welcomed into Jeff's family, joining them for significant occasions,
> and visiting his brother and family abroad. . . . For his 70th birthday [Paul] invited
> me to join them all for a wonderful week in Tuscany.  With all the attractions and
> diversions around, it was clear that the most important and meaningful part of the
> trip for Paul was when we were all together for dinner every night.

(Rachel Clark.)  As may be clear, once someone is part of Mr. Konigsberg's extended family,

they have a lifelong supporter, advisor, and friend:

> I met Paul in 2001.  In 2002, I married his step-daughter.  Today, I am divorced
> from his step-daughter, but I still maintain a strong, caring relationship with Paul,
> his wife, Judy and my ex-wife, Allison—who is the mother of my only child,
> [M.F.].
>
> Since our first meeting, Paul has been a mentor, a father-figure and a friend to me.
> . . . In his dealings with me, his fair-mindedness, his generosity and his morality
> have always been present and obvious.  And, from my observation, as a fly on the
> wall at times, anyone who truly knows Paul knows he is amongst the rarest
> [breed] of altruistic human beings, and someone who is easy to respect and love.

(Jason Feldman.)

Mr. Konigsberg now has seven grandchildren who have been welcomed into the

Konigsberg family with open arms—they truly mean the world to him.

> For the last ten years, I've watched Paul expand this sense of family in his seven
> grandchildren – two are his son's children, four are my brother's children, and
> one is my daughter.  These kids love and adore him and bring him more happiness
> than anything else in the world.  He hasn't been able to see much of his two grand
> daughters in Moscow because of his inability to travel.  But the four grand
> children in Massachusetts and one in New York City see him as often as possible
> and we all count these as our favorite family times.  My daughter [M.F.] is ten
> years old – she was the first grand child and she idolizes her Papa.  Together they
> swim, climb trees, pick oranges, play catch, solve math problems, dance, and talk
> about her many talents - all of which seem to bring Paul tremendous joy.  My
> greatest wish is that I can watch their relationship continue to flourish as [M.F.]
> grows up.

(Allison Feldman.)

> [T]he most important example Paul has set for me, is how devoted and loving a husband, father, brother, friend, and grandfather he is, and has always been. Nearly every day when I get home from work, my 2-year-old identical twin daughters chant in unison… "Call Papa, call Papa, call Papa" signaling that they want to video chat with Paul.

(Matthew Feiner.)  "No one could be a more doting grandfather than Paul.  For many years he would travel to Russia to visit with his two granddaughters or to be with Allison and her daughter or with Matthew and his children in Boston."  (Herbert Corbin.)  "Paul is a family man, both as a loving father and grandfather who dotes on his children and especially his pride and joy, his grandchildren."  (Jerome Miller.)  "Paul has been a wonderful father and step father to his and Judy's now adult children and a terrific, warm, caring, energetic and funny grandfather to their many grandchildren."  (James Schreiber.)

## F.   Mr. Konigsberg's Career

While Mr. Konigsberg was nurturing and supporting his growing family, he was building a successful accounting business.  When they were young, Mr. Konigsberg and his brother Robert started a bookkeeping business to earn extra money.  (Robert Konigsberg.)  Around 1966, Mr. Konigsberg went to work for his father's accounting business, which his father had founded in or about 1936.  At the same time, his brother, Robert, went to work on Wall Street. Approximately four years later, Robert had "lost everything."  (*Id.*)  "The day I closed my business, Paul called and invited me back as a full partner.  Never once did he bring up his success and he was willing to share all with me."  (*Id.*)  At that point, in the early 1970s, their father's business had four professionals and a secretary.  Over the course of approximately the next 40 years, Mr. Konigsberg and his brother grew their business—Konigsberg Wolf & Co., P.C. ("Konigsberg Wolf")—through hard work and a compassionate corporate culture.  When Mr. Konigsberg's brother, Frederic, graduated from law school, Mr. Konigsberg welcomed him

to Konigsberg Wolf "to teach [him] the basics." (Frederic Konigsberg.)[2] Ultimately, Mr.

Konigsberg became the President of the company, his brother Robert was Vice President, and

they employed over fifty professionals running what many acknowledge was a successful,

respected business in New York City.

　　　　Many people—including victims of Madoff's Ponzi scheme—have gone out of their way

to comment on the ethical, reputable manner in which Mr. Konigsberg ran his business.  For

example, one of Mr. Konigsberg's clients stated:

> [A]s an officer of this Court, on the experience of a lifetime, and as God is my
> judge, during the 4 to 5 decades in which Paul was my accountant and confidant,
> his counsel was always strikingly and emphatically to take the most conservative,
> transparent, straight-forward and thoroughly honest and risk-free path in all my
> business dealings and financial and tax matters.  I would also note, as a mark of
> who we were to each other, and as a measure of his generosity, that I never
> received a bill or was charged any fee by Paul or his firm for what had to be well
> over 40 years of being my personal accountant, doing joint personal tax returns,
> and giving me his views on all manner of things that came up during my legal
> career and dealing with my personal finances. . . . From 1979 to 1999, and
> thereafter, Paul was the accountant for [my law firm, Waesche, Sheinbaum &
> O'Regan, P.C.].  Again, at every turn, Paul's counsel was always to take the most
> conservative, scrupulous, correct and cautious approach in all we did business-
> wise, financially and tax-wise.  It was his hallmark.

(Louis Sheinbaum.)  Donald Kramer, who has known Mr. Konigsberg "personally and

professionally for over 44 years," noted "I truly believe Paul is honest, responsible and hard

working."  Joel Boyarsky, who has known Mr. Konigsberg "both in a business and charitable

manner for almost 20 years," found that "[i]n all of my dealings with Mr. Konigsberg . . . I have

only found him to be forthright and very caring."  Bert Brodsky first met Mr. Konigsberg "in

---

[2]  Later, when Frederic wanted to "venture out on my own, [Mr. Konigsberg] subsidized me in my own
law practice to give me the impetus to move on in my own direction. . . . This was a selfless and kind
act that has never been forgotten because it allowed me to be my own person and to develop the
confidence and self worth that I personally needed having stood in the shadow of my two older
brothers for so long.  Paul had the compassion to understand what I was going through and to
facilitate my growth and independence."  (Frederic Konigsberg.)

1977 when he was representing the other side of a transaction I was involved in.  I was very impressed with his reputation and hired him for my business purposes.  He has been my business advisor, accountant and friend for 37 years."  Richard Leder, "a fellow tax professional . . . found Paul to be beyond reproach."  Paul Levinsohn, a client and friend of Mr. Konigsberg, commented that Mr. Konigsberg "has always been highly professional and exhibited the utmost integrity on all matters."  Richard Pearl, a Managing Director at First Manhattan Co. observed that "Paul Konigsberg has the highest integrity of any professional that I have dealt with."

Similarly, several of Mr. Konigsberg's employees noted that "[w]hen difficult situations arose at work with some of the clients, he always steered us to be ethical, honest and to comply with the laws of this country."  (Joseph Fierro.)  Mr. Konigsberg "has been a great mentor to me. . . . He has taught his staff the ethical importance of our profession."  (Christine Gelormino.) "On a professional level whenever we encountered difficult decisions with clients he always chose the path that was both correct from an ethical and legal perspective.  Never did he ask me to cross a line and he always supported my philosophy if the client does not want to follow the rules then they are not a worthy client."  (Paula Iacovissi.)

In addition to teaching his employees to be honest and ethical, Mr. Konigsberg treated them with respect.  "Everyday acts of kindness are the usual for Paul, and not the exception.  He was a smart and ethical counselor on all matters related to tax law as well as personal matters that concerned anyone in the business office.  His door was always open for guidance and comfort.  Whether you were a secretary, mailroom clerk or partner, you were treated the same— well."  (Lawrence Bass.)  "One of the things I admired most about Paul Konigsberg is his fairness in treating his employees.  As the receptionist I felt as important to the Company as anyone else[;] that was the magic of Paul Konigsberg."  (Marcia Beverley.)  "Paul was one of the

best employers that I have ever worked for.  He always respected his employees and treated us

like human beings - both personally and financially.  I always felt that I could talk to Paul."

(Joseph Fierro.)  Joel Cooperman noted that Mr. Konigsberg's employees "genuinely love and

respect him," and Bonnie Wolpe even convinced "four people to come to work for [Konigsberg

Wolf], people who had worked for me in the past," because "I was very impressed by his

treatment of staff[;] . . . Every one of them had very happy memories working for Paul."

"In the harsh realities of the public accounting business he ran a very humanistic firm that

rewarded hard work and loyalty. . . . he recognized employees' dedication and treated us with

kindness and respect."  (Robert Katz.)  For instance, Michael Gershon explained how Mr.

Konigsberg "showed me the right way to treat people, both clients and employees.  For example,

there was a time in 2004 that I wanted to dismiss an employee, but Paul would not because of

how it would impact their family as the employee's wife had recently given birth to their child.

The compassion he showed was truly a life lesson."

In many ways, Mr. Konigsberg's employees became part of his extended family.  He

looked out for them, protected them, and supported them in countless ways that go far beyond an

employer's obligations.  "[T]he entire office staff at his firm (Copy room people to receptionists

to office managers) - knew they could ask for his help personal or otherwise and he would be

there for them."  (Steven Yavers.)  When Luisa Bonilla's mother died, her "son was five weeks

old . . . [Mr. Konigsberg] allowed [her] to stay home two more weeks with full pay."  And "when

[she] got hit by a car crossing the street, [Mr. Konigsberg] told [her] to take care of [her]self and

[that she] should not return to work until [she] was completely better, always with full pay."

(Luisa Bonilla.)

Christine Gelormino recalled that, "[i]n my 12 plus years at Konigsberg, he always

13

treated his employees like family."  In her case:

> When my brother died unexpectedly, Paul came to his wake (about 100 miles
> from his home) and waited in line among a thousand mourners to pay his respects.
> He took the time to meet my family and console my mother.  He offered to help
> my family in whatever way we needed.  His presence at the wake has left a lasting
> impression on me and to this day, I am still comforted in knowing he was by my
> side when I needed support the most. . . .
>
> [In addition,] he helped me get the best doctors to better treat a major lung disease
> that I developed.  He was worried that the treatment I was receiving was causing
> serious complications – he was right. . . . I honestly do not believe I would be here
> today writing this letter about Paul, if it had not been for Paul intervening in a
> health crisis that I did not fully realize at the time, which was at the same time I
> was mourning the loss of my brother.  Nobody but Paul said they were worried
> about my health as a result of my poor treatment. . . . No words can express how
> truly thankful I am for his caring efforts.

(Christine Gelormino.)  Similarly, Paula Iacovissi noted that while she was "in [Mr.

Konigsberg's] employ I had several tragedies and personal matters to handle[;] it was during

these times that [Mr. Konigsberg's] true character came through.  He was there to offer

assistance, advice and comfort.  I cannot say enough to convince you of his kindness, generosity

and sense of family that I can tell you that he has earned my utmost respect, gratitude and

admiration, which remains unwavering even as of today."  George Rosenfeld likewise recounted

Mr. Konigsberg treating him like he was "part of his immediate family."

> On one occasion, I[] was in great distress ████████████████████
> while working, so [Mr. Konigsberg] just took me straight to the emergency room
> at the nearest hospital himself, and waited till he was able to speak to a doctor
> regarding my condition.  This was during tax season, the busiest time of the year
> for him.  In another instance, I had to . . . check into the hospital for a ██████
> procedure.  While I was there for 4 days, Paul had contacted the hospital, and had
> one of the medical administrators check up on me several times each day, to make
> sure everything was going well, and to make sure I was getting the proper care.

(George Rosenfeld.)  When Lawrence Bass, ████████████████, fell ill and fainted in the

office one day, fearing that he was going to die, "[i]t was Paul who stayed by my side, called 911

and made sure that after I had been transported to the hospital that the Emergency Room was

14

properly taking care of me." (Lawrence Bass.) On another occasion, the father of "a young
administrative assistant" in the office "suddenly died of a heart attack[,] so Paul paid the tuition
for night classes in computer science so he could improve his career." (Robert Katz.)

And Marshall Zieses recounts a touching experience where Mr. Konigsberg came to his
aid and provided the "miracle" that saved his young daughter's life when he and his wife feared
all hope was gone:

> When my daughter Caryn was about two and 1/2 years old (in 1982), she
> developed a 105 degree fever which would not come down no matter what
> medication she was given. She became too sick to eat and began losing weight at
> an alarming rate. Most doctors that we called were too "booked up" to see her.
> The doctors who did see her were unable to properly diagnose the problem. We
> feared that we would lose her without something close to a "miracle."
>
> Paul supplied the "miracle."
>
> I went into his office one morning intending to ask for some time off to try and
> help my daughter. I explained the situation to him including the inability of many
> doctors to even see her let alone diagnose the problem. . . . his response was "why
> didn't you tell me sooner?". . . Somehow, within 48 hours, he managed to set up
> testing for Caryn under the care of Dr. Kogan, a "top" pediatric urologist at
> Einstein Hospital. Thank God, Dr. Kogan reviewed the test results and knew
> immediately what the problem was.
>
> Today, Caryn is happily married and the mother of a beautiful baby boy. Without
> Paul's intervention, I'm not sure that she would be alive today.

Mr. Konigsberg not only supported his employees during times of personal crisis, he took
an interest in their everyday lives. "He had lunch with us often and sometimes paid for it too."
(Christine Gelormino.) Michael Gershon recalls to this day an instance in which "I did not have
the financial wherewithal to send my son to summer camp. However, without my asking, Paul
gave me $3,000 toward the summer camp fee so that my son would not be disappointed. Paul's
generosity had a profound effect on the lives of me and my family." Robert Katz similarly
remembers several instances of kindness and compassion that Mr. Konigsberg showed him
during his employment at Konigsberg Wolf, which in turn allowed Mr. Katz to be a better father

and son for his own family:

> My wife was a New York City public school teacher and had to be in school at 8:40.  Our babysitter suddenly quit during tax season and we were unable to quickly replace her.  Paul had no problem with my coming to work later in the morning so I could get my daughter ready for school and on the bus.  Both of my parents had protracted illnesses and I never had to ask for permission to take time for hospital and nursing home visits in Rockland County, N.Y.  When they passed away I was told to come back to work whenever I was ready.

Marcia Beverley, a receptionist for Konigsberg Wolf, noted that Mr. Konigsberg "would give my son," who "coaches a summer basketball League for at risk youths in Brooklyn[,] . . . advice, support and encouragement whenever he needed it."  And Isaac Lamm and his wife:

> will always remember the time when I shared with Paul that I was emotionally and physically overwhelmed by family and business obligations.  I will never forget the compassion in Paul's eyes as he quietly listened and then told me to take my wife on a 2 week vacation which he paid for – airfare and hotel stay – from his personal funds. . . .

> [On another occasion,] [m]y daughter was a senior in high school and was involved in the planning of a class trip to Washington DC.  Just a few weeks before the scheduled trip, the class was informed that the trip was being cancelled due to lack of funds.  As you can imagine, the students were devastated.  One afternoon, in a passing conversation, I mentioned this situation to Paul.  Without a seconds hesitation Paul said that it would be his pleasure to fund the trip.  Paul never met the school officials.  He just sent a check, large enough to include every aspect of the trip, without expecting anything-even acknowledgment-in return.  He gave over 200 young high school students an unforgettable trip that will remain with them for a lifetime.

Perhaps John Thornton summed it up best:  "You don't ask Paul for help, he offers it."

As these many examples reflect, Mr. Konigsberg made himself available to his employees, earning their trust and respect.  "He is very approachable and I never felt afraid to ask him a question."  (Christine Gelormino.)  "I saw him lend support, emotional and financial, to employees and their survivors.  He gave extended sick time with full salary in situations where terminal illness existed.  His office door was always open to employees and friends who had problems, whether big or small.  He did his best to help and was adored by those who knew

16

him." (Abraham Goldner.)

Accordingly, it should come as no surprise that, after Madoff's Ponzi scheme was uncovered and Mr. Konigsberg's association with Madoff was publicized, Mr. Konigsberg did everything he could to save the jobs of his employees and keep the business going. At or about the end of 2010, Mr. Konigsberg combined his business with that of another individual and changed the name of the business to KMR LLP. (Presentence Report ("PSR") ¶ 125.) After a few months, Mr. Konigsberg and his brother determined that the venture as KMR was not working out, and in order to save the business they would have to sell it to a larger firm. As they sought out potential buyers, Mr. Konigsberg and his brother made clear that they would only sell the business to someone who was willing to take on all of their current employees. As Robert Katz explained:

> When the firm merged with Citrin Cooperman in 2011, practically everyone was brought along and Paul insured that our positions in the new firm would be secure, unlike many other merger situations. Paul turned down another potential merger because the successor firm only wanted his clients but not most of the employees.

Christine Gelormino also commented that she and her fellow Konigsberg Wolf employees "were very fortunate not to be among the millions of job-seekers unsuccessfully searching for employment. The owners of Konigsberg [Wolf] made sure that we were part of the merge package."

In addition, during this period of tremendous personal turmoil in which Mr. Konigsberg, among other things, gave up his company and was indicted, he still took the time to advise and assist his employees, looking out for their best interests as he always had, even to his own detriment:

> [After KMR merged with Citrin Cooperman,] I was not happy with the new firm and decided to leave it last year. Most of my clients, including many that had been Paul's clients, elected to go with me rather than staying at the new firm.

> If he had chosen to do so, Paul could have easily spoken to each of these clients and asked them to stay with him.  Instead of attempting to retain them he told me that after working together for the aforementioned 35 years and knowing that I was tight financially, he would not stand in the way of my taking those clients even though it would negatively impact his revenue stream from Citrin. As if that wasn't enough, Paul even helped me decide which accounting firm would be the best fit for me to join.

(Marshall Zieses.)

## G.   Community Involvement

Mr. Konigsberg's kindness and compassion extended not only to his family and employees, but also to many others in the community at large.  "[T]he numbers of people that he has helped during his lifetime is countless. . . . I once recall sitting with [Paul and his brother] in the early 2000's and they told me 'If we spent 1/2 of the time we spend helping others on our own business, we probably could have become very wealthy men.'  But their preference was always to be there for others."  (Steven Merdinger.)  John Thornton attests to the fact that, "I have personally witnessed Paul demonstrating sincere caring for others, true concern for people and the unselfish giving of his time and counsel for the benefit of not only his friends but for and to people he doesn't even know.  He offers this with no expectations in return."  Larry Field similarly observed that "I have known Paul to be an upstanding individual, generous, caring and never turning down a request to help his fellow man."

For instance, when Mr. Konigsberg learned that his barber was in deep financial distress, Mr. Konigsberg "gave him the money he desperately needed to recover and support his family. Showing his gratitude, the barber offered to give Paul free haircuts for the rest of his life but Paul declined, wanting to show his ongoing support."  (Judith Konigsberg.)  As a testament to this generosity, Mr. Konigsberg's barber wanted to submit a letter to the Court.  Written in Italian, he states:

> The undersigned, Ray Dugo, declares that I know Mr. Paul Konigsberg for a long

time, around 30 years, and I can say that he is a gentleman, honest, selfless and generous.  I am sure that anyone would want a friend like him.  I personally can confirm that he is a good and generous person.  In the past I had some financial problems, and he helped me a lot.

(Ray Dugo.)  When Mr. Konigsberg's brother inquired about this gift of money to Mr. Konigsberg's barber, Mr. Konigsberg "said because he is in need."  (Robert Konigsberg.)

Mr. Konigsberg has been generous with his time and expertise.  In one instance, he "donated his time to help a 'not for profit' art gallery in maintaining their books and status[.]" (Richard Ader.)  When he heard about a friend's illness, he offered his accounting services free of charge until his friend recovered enough to take over:

> In 1969, I contracted ████████████████ and was paralyzed from the neck down (quadriplegic).  While I was phasing out of accounting to devote my entire attention to the practice of law, I still had a major accounting client.  Upon learning of my disability, Paul offered to and rendered services to my client for about one (1) year until I recovered and would not accept compensation for his work.

(Lawrence Greebel.)  In response to another colleague's worsening health issues and to spare his colleague from any traveling, Mr. Konigsberg traveled to his colleague's home in Mamaroneck, New York "to obtain the information necessary to prepare the income tax returns for my wife and I.  Throughout this period, neither Paul nor his firm ever sent a bill, or accepted payment from us, for his tax preparation services."  (Stephen Kushel.)

Similarly, whenever Mr. Konigsberg learned that his friends' children or elderly parents were in need of assistance or guidance, he was more than happy to help.  "Throughout the years, Paul has . . . met with our children on numerous occasions and counseled them about their college and career choices, and other important decisions affecting their lives."  (Richard and Barry Kringstein.)  When James Anchin's son was searching for a new job about three years ago "during this difficult time period, . . . Paul took the time and made calls to help him out."  (James Anchin.)  And, as John Thornton recalls:

> [D]uring casual conversation I mentioned to Paul that one of my [sons] was
> considering opening a business.  Without hesitation, Paul invited Scott to his
> office and [sat] with him for a considerable time offering guidance.  Thanks in
> part to Paul[,] Scott is now doing business in several states.  At another time I
> mentioned to Paul my elderly mother may be in need of nursing home/assisted
> living care and immediately he offered to contact people he was associated with
> in an effort to expedite her care.  In addition, I have personally overheard Paul, on
> many occasions, on the phone offering different types of assistance and financial
> aid to others.

Early on in his friendship with Tom Rosenthal, Mr. Konigsberg went out of his way to

emphasize that he would help Mr. Rosenthal with whatever he might need to support his new

venture:

> I was experiencing some financial problems and didn't know if my new venture
> would succeed.  When discussing my situation with Paul, his immediate response
> was, "Tommy don't worry.  If you need a phone, office or secretary, I will always
> create a spot for you from which you can work."  I wasn't even looking for any
> such favor yet Paul was quick to make sure that if necessary, he would offer help
> and there was never any discussion on how he would be reimbursed.  He just put
> his arms around me and gave me a hug as if to say, "I'm here for you."

(Tom Rosenthal.)

When his employees at work asked for a donation, "[h]e always had his checkbook ready

and the donation was always above and beyond what they hoped for."  (Christine Gelormino.)

As a true mark of his deep-seated concern for others and his selfless desire to give back, Mr.

Konigsberg has offered to help "anyone who needed assistance . . . in any way *that person*

*needed*, not any way that Paul could."  (*Id.* (emphasis added).)  "In one case . . . , a friend with a

troubled child could not find a job, so Paul created one at his firm."  (Richard Leder.)  Even

"recently, during the ordeal that he is going through at this time[,] he became aware of an old

friend who had fallen on hard times and Paul did not hesitate to provide meaningful financial

assistance to help this individual in his own difficult situation."  (Harvey Schulweis.)  "Paul is a

person of the finest moral character, integrity, always willing to become involved in other

people's problems, and always doing so with a genuine spirit of doing the best he can under the

circumstances." (Leonard Boxer.)

When Mark Green, former Public Advocate for New York City, ran for mayor of New York City in 2001, Mr. Konigsberg served as the treasurer for Mr. Green's campaign. (Mark Green.) "Throughout, Paul was meticulous, efficient, responsive and personable – and maintained his professionalism under the significant pressures of a major candidacy." (*Id.*) Mr. Green noted that "Paul is among the most honorable people I've known" and "I remember feeling enormous gratitude and relief that someone of Paul's stature and skills was on my side." (*Id.*) And then, after the campaign when Mr. Green's "not-for-profit ran out of money, [Mr. Konigsberg] waived his already discounted fees." (*Id.*)

More than anything, Mr. Konigsberg has always been mindful of others. Whether providing financial assistance, emotional support, or professional advice, for many, the most meaningful part of Mr. Konigsberg's compassion is the knowledge that there is someone out there who cares. "During a most difficult time in my life, Paul was one of my friends who made sure that I was okay. On a regular basis, Paul would phone me just to make certain that life's problems were being handled by me." (Lester Wohl.) "Some years ago when I experienced difficult times, Paul was very supportive and his guidance and succor were very meaningful to me. I am certainly not the only person to have benefitted from Paul's help." (Stephen Krass.) "I observed his compassion and caring when two of our friends passed away from cancer. He was very visible tending to the families of these friends." (Stephen Weinberg.) "In my own case when he found out I was going through some financial crisis he offered and I accepted his assistance. He seems to be there with a helping hand for all those he knew." (Gerald Newman.) "In my own life, my wife and I have experienced several major difficulties and stressful events in our later years. Paul has always been there for us with support, encouragement and

compassion, as few have the capacity to convey and provide." (Louis Sheinbaum.) "In 2010 when I had serious spine surgery, Paul was there and supportive throughout my recovery. Paul cares about people. He is not selfish. He's a good person." (Stephen Weinberg.) "In everything we did, Paul has always been interested in what he thought was best for me. He has always been there for me when I needed him. I have witnessed his loyalty, not only to me but to all his many friends and clients." (Steven Yavers.)

## H.   Humanitarianism

In addition to actively supporting the many individuals who have crossed his path at one point or another, Mr. Konigsberg is also a pillar in the community with respect to charitable giving and volunteering. As discussed above, Mr. Konigsberg was taught early on that giving back is a way of life, and he has consistently participated in several charitable organizations over the course of his life.

Importantly, as several people have pointed out, Mr. Konigsberg is "a significant contributor to both charitable and socially responsible causes not simply through capital contributions but through hard work." (Donald Kramer.) "Paul showed concern and passion for those in need. More than financial support, Paul gave generously of his time and expertise. . . . His financial contributions and his personal dedication to the important causes for which he volunteered his time and effort have certainly made a better life for the people he served." (Andrew and Froma Benerofe.)

Mr. Konigsberg is "one of the most charitable of the men in my peer group, manifested not only by cash contributions but of time he puts in working for several of his favorite charities. He is truly hands on for these organizations as he tries to help them raise money." (Jerome Miller.) Mr. Konigsberg was not only a "generous philanthropist[,] but worked for those institutions." (Philip Altheim.) "[R]egardless of how busy Paul is, he always finds an enormous

amount of time to use his expertise to assist charitable institutions by serving on their boards or volunteering in different leadership roles because they needed the help. . . . I can't remember Paul ever turning away from an opportunity to help others."  (Tom Rosenthal.)

As Peter Solomon noted, while serving "the City as Deputy Mayor, [I] learned the importance of committed private citizens to the vitality of our society.  Paul Konigsberg's life is a testament to vitality, concern for others and the value of character."  And Samuel Weinberg emphasized that even now, Mr. Konigsberg continues to pursue service to others; "[h]e wears his heart on his sleeve and cares about so many things and so many people even when he himself has been under unbearable pressure and stress during the last few years."

1. UJA-Federation of New York

Mr. Konigsberg has been assisting the UJA-Federation of New York ("UJA") (http://www.ujafedny.org/) in one form or another for almost forty years.  This charitable organization cares for people in need, inspires a passion for Jewish life and learning, and strengthens communities in New York, in Israel, and around the world.  They enable Jews to "overcome crises, cope with the struggles of everyday life, and achieve self-sufficiency." (http://www.ujafedny.org/who-we-are/our-mission/.)  Their "caring hand extends to those living in poverty, the aging, Holocaust survivors, children and adults with disabilities and special needs, and the unemployed across the economic spectrum."  (*Id.*)  They "provide access to crucial human services to all New Yorkers, whoever they are, and Jews everywhere."  (*Id.*)

Mr. Konigsberg began volunteering with UJA as a young man and gradually rose through the ranks to ultimately serve as their treasurer, a member of the Executive Committee, and Chairman of their Audit Committee.  (Harvey Schulweis; John Ruskay; Stephen Solender.) Over the course of Mr. Konigsberg's work for UJA, he raised millions of dollars for this

organization, contributed his own money, and worked in many different areas of the organization from fundraising, to helping the elderly in NYC, to working with kids with troubled pasts.  Mr. Konigsberg traveled to Israel many times with UJA, providing significant assistance to the country and its people during multiple conflicts.  He also traveled to Italy to provide assistance to Russian Jews seeking to enter the United States and Israel, and most recently he led a humanitarian trip to Cuba to provide medical supplies to Havana's poor.

Paul Kane, who serves as UJA's Chief Financial Officer, commented that Mr. Konigsberg "has given numerous hours on a weekly basis to help support the work of UJA-Federation, which mainly focuses on those who are most needy.  Besides taking on key leadership positions here at UJA-Federation, he has also been a generous financial supporter of the federation. . . . Paul is one of the most gracious, giving, caring human beings I have ever worked with. . . . UJA-Federation only wishes we had more Paul Konigsbergs."  John Ruskay, who served as UJA's Executive Vice President and CEO for twenty-two years agreed that:

> Paul was a dedicated member of UJA-Federation's Executive Committee for four years and served as Chairman of the Audit Committee for three years.  In each of these capacities, Mr. Konigsberg took his responsibilities seriously, was diligent in all areas and pursued matters large and small.  He recognized the reputation of UJA-Federation and the trust of our donors was essential.  He did whatever was needed to strengthen it. . . .

> Truth be told, having worked with thousands of New York's "best and brightest" volunteers, I can say that Paul Konigsberg was one of the finest, most decent and most devoted volunteers that I have encountered.

> Mr. Konigsberg provided his time, leadership and resources to help those most in need in our community and expected nothing back.  What he received in return was the satisfaction of knowing that he had shared his resources with those who had been left out of the bounty that so many of us enjoy.

> I consider Mr. Konigsberg a dear colleague and friend, an outstanding individual, and one who has demonstrated over decades his abiding commitment to our community and those most in need.

Stephen Solender similarly noted that:

> During my tenure at the organization, Mr. Konigsberg was a very significant member of UJA-Federation's Board of Directors and Executive Committee. . . . Mr. Konigsberg gave informed and very helpful advice as programs and services of many of UJA-Federation affiliated agencies were reviewed. . . . he also gave leadership to the organization's fund-raising strategic review and to its Annual Campaign Cabinets. . . . In summary, he has been an outstanding philanthropic leader at UJA-Federation for many years.

In connection with his work for UJA-Federation raising money for Israeli bonds, Mr. Konigsberg has been honored by Israel both in New York and Florida, receiving a medal of honor on one occasion. As Bonnie Wolpe recalls, she attended "the UJA luncheon which named [Mr. Konigsberg] man of the year. Hundreds of people were there to honor him."

When Mr. Konigsberg organized a charitable mission to Cuba through UJA, he encouraged people to "bring as many pharmaceuticals as [they] could (antibiotics, like Penicillin) to help stock a free pharmacy that gave these drugs to anyone in need." (William Apfelbaum.) In addition, "it was Paul who suggested that we all leave our clothing and shoes (before we flew back to the US) at the same facility also to be given to Havana's poor." (*Id.*)

2. Support for Israel During its Military Conflicts

Mr. Konigsberg has repeatedly traveled to Israel over the years to show his support for the country and its people. His first wife, Gloria, vividly recalls when Mr. Konigsberg "travelled to Israel putting his life in harm's way during the SCUD missile crisis." (Gloria Konigsberg.)

As Stanlee Stahl explained, Mr. Konigsberg extended his compassion for his community to individuals in Israel during the Second Intifada, connecting on an individual level and offering his kindness and support during a very difficult time:

> During Israel's second intifada, I had the occasion to travel with Paul Konigsberg and a handful of other Jewish communal leaders from New York to Israel to support the Israeli people as they were being subjected to daily rocket attacks. Paul quickly emerged as a leader of the group. I was taken by his compassion when meeting children and their parents in the north of the country who had been sleeping in bunkers for months, or when we met with the wife of one of three

25

kidnapped Israeli soldiers, or when we went to the ruined home of elderly
Holocaust survivors from the former Soviet Union whose apartment had been
destroyed by rockets fired from Lebanon by Hezbollah.  Paul took the time to
speak with the children in the bunker, the wife whose husband was missing, and
the elderly Holocaust survivors and gave each comfort and support.  Others in the
group did not extend themselves, Paul did.

Tom Rosenthal remembers that Mr. Konigsberg "flew to Israel to stand beside citizens and sat in

bomb shelters with gas masks on during the Iraq war to show his loyalty and support.  This was a

time when most were cancelling their plans to Israel.  Paul is not only a wonderful person, but a

role model and citizen."

3.  Albert Einstein College of Medicine of Yeshiva University

Mr. Konigsberg was also "a long time member of the board of the Einstein College of

Medicine of Yeshiva University.  For many years he was the chairman of its budget and finance

committee, a critical role for that organization."  (Harvey Schulweis.)  This premier, research-

intensive medical school is "dedicated to innovative biomedical investigation and to the

development of ethical and compassionate physicians and scientists."  (http://www.einstein.

yu.edu/about.)  Mr. Konigsberg decided to become involved with the Einstein College of

Medicine because he wanted to help doctors and the medical community in their mission to save

humanity.  "He was a tireless worker on behalf of [Einstein College of Medicine] for many years

and was honored by the institution one year, raising one of the highest amounts of pledges for the

benefit of the medical school in its history."  (Samuel Weinberg.)

During the twenty years that he donated his time, skills, and resources to Einstein College

of Medicine, Mr. Konigsberg raised millions of dollars to help further its causes, including

research on cancer, heart issues, and Alzheimer's.  In addition to serving on the board of the

Einstein College of Medicine and being the Chair of its Finance Committee, Mr. Konigsberg also

served on the audit committee of Yeshiva University.  (Morry Weiss; Ruth Gottesman.)  In 2008,

the Men's Division of the College honored Paul with the Albert Einstein Humanitarian Award. (Lawrence Greebel.)  While he served as the College's Treasurer, Mr. Konigsberg helped to build the Michael F. Price Center for Genetic and Translational Medicine, a state-of-the-art facility dedicated to advancing a broad array of biomedical research that is applied directly to patient care.

At the same time, Mr. Konigsberg's interest in individuals and giving back to those less fortunate remained present.  Richard Joel, the President of Yeshiva University, observed that Mr. Konigsberg "is always a gentleman and was deeply committed to adding value to medical education.  While dealing with complex policy issues, Paul was always sensitive to other people's views and focused on positive outcomes.  In casual conversation, his concern for values and principles [was] strongly present."  Morry Weiss, the former Chairman of Yeshiva University, similarly noted that:

> What impressed me at that time about Paul was his level of commitment and dedication to making it possible that young men and women who lack the financial means for outstanding medical school education be given every possible opportunity.  Paul not only contributed his time, his vast knowledge, his resources, but solicited others to make for many students in need a medical school education possible.

Ruth Gottesman, Chairperson Emerita of the Board of Overseers for Einstein College of Medicine, remarked that, in addition to looking to Mr. Konigsberg for advice on the fiscal situation of the medical school, "I found Paul to be a kind and thoughtful man.  He seemed genuinely interested in others."  And Allen Spiegel, Dean of Einstein College of Medicine, observed that "[i]n all my interactions with Mr. Konigsberg, I have found him to be a forthright individual dedicated to the advancement of worthwhile causes.  He provided useful service to a number of non-profits without regard to personal enrichment."

4.  The Jewish Foundation for the Righteous

The Jewish Foundation for the Righteous ("JFR") (https://jfr.org/) provides financial support to more than 500 non-Jews who rescued Jews during the Holocaust and preserves their legacy through a national education program.  Stanlee Stahl, the Executive Vice President of JFR noted that Mr. Konigsberg "was one of the first of the Foundation's donors I met" when she joined the organization in 1992.  Harvey Schulweis, the Chair of JFR for the past twenty five years, said that he "will be forever grateful to Paul for his board participation and generous financial support for this organization over many years."  Ms. Stahl further explained:

> In addition to providing generous financial assistance to the JFR over these past twenty-three years, Paul has served as an invaluable advisor on many issues ranging the gamut from financial and audit assistance, to personnel matters, to insuring that the JFR's administrative systems work efficiently and effectively. Paul was generous with his time and wise counsel.  He helped establish our financial systems, our employee benefits package, and provided advice on donor events.  He did this as a volunteer and unlike many volunteers; he did not walk away once a program was established.  He continued to work with staff to make sure that everything was operating as it should.
>
> He understood so very well the risks taken by Christians during the Holocaust who helped Jews survive the Third Reich.  Paul would talk about the altruism of the rescuers, for anyone caught helping a Jew in Eastern Europe during the war would be killed.  It was important to Paul to help repay a debt of gratitude on behalf of the Jewish community and to say thank you to Christian rescuers.

(Stanlee Stahl.)

5.  West Side Jewish Community Center

Mr. Konigsberg also found time to serve as a board member of the West Side Jewish Community Center (http://www.jccmanhattan.org/), where he was an "active" member.  (Harvey Schulweis; Ruth Gottesman.)  Founded in 1989, this community center develops volunteer programs and creates innovative programs to provide opportunities "for people to connect, grow, and learn within an ever-changing Jewish landscape."  (http://www.jccmanhattan.org/about/

28

mission-history/.)

6. Auschwitz Jewish Center Foundation

This organization was created by a small group of people who found and then restored the sole remaining synagogue in Auschwitz (http://www.mjhnyc.org/a_affiliates_ajc.html #.VU_8nflViko).  Their mission is to honor the former residents of the town (the majority of whom were Jewish) and to teach future generations about what was lost.  James Schreiber, a former Assistant United States Attorney in the Southern District of New York, explained how Mr. Konigsberg generously donated his services to this organization:

> My wife and I are . . . a part of small group who found and then restored a small synagogue in the Polish town of Oswiecim, more widely known by its German name Auschwitz. . . . In the late 1990's, we took title to the sole remaining synagogue in the Town and about ten years ago, when we merged our Auschwitz Jewish Center Foundation with the Museum of Jewish Heritage in Battery Park, New York City, Paul generously had his firm do the accounting work.

7. Gift of Life Bone Marrow Foundation

Gift of Life (http://www.giftoflife.org/) is one of the nation's public bone marrow and blood stem cell registries.  "Through its life-saving work, Gift of Life is a world leader facilitating transplants for children and adults suffering from many life-threatening diseases, among them leukemia and lymphoma."  (http://www.giftoflife.org/Pages/Bone-Marrow-Registry-History-Overview.aspx.)  Mr. Konigsberg served as a member of their Board and their Treasurer for several years, and was honored to work for an organization that helped so many people live productive lives when they felt all was lost.

8. New York Board of Rabbis

Rabbi Joseph Potasnik, Executive Vice President of the New York Board of Rabbis (http://www.nybr.org/), "recognize[d] [Mr. Konigsberg's] many contributions to the welfare of

our community."  He noted that Mr. Konigsberg "faithfully served as a member on our Lay

Advisory comprised of people of different faith traditions working on issues which impact the

larger community.  I would often seek his guidance on a particular subject because I valued his

profound insight and intelligence."  (Rabbi Joseph Potasnik.)

9.  Selfhelp Community Services

Stuart Kaplan is Chief Executive Officer of Selfhelp Community Services

(http://www.selfhelp.net/), "a non-profit health care and social service provider dedicated to

enabling the elderly and other at-risk populations within New York City to live in their own

homes independently and with dignity.  The organization was founded in 1936 to help Holocaust

survivors fleeing Nazi persecution to find new lives in America."  Today, Selfhelp cares "for

over 20,000 elderly in the New York area, and as the oldest and largest provider of Nazi victim

services in North America, [they] serve over 5,300 Holocaust survivors in our community."

(Stuart Kaplan.)  Mr. Kaplan noted that Mr. Konigsberg served on the Board of Selfhelp for

three years, until he relocated to Florida, and even now Mr. Kaplan continues to speak with Mr.

Konigsberg "at regular intervals, with Paul always seeking to find out what's new at Selfhelp and

expressing his continuing desire to be of help."

> In 2010, Paul was introduced to me because of his sincere interest in providing
> care for, and restoring dignity to survivors of the Holocaust and other frail elderly
> populations.  From the first time I met Paul, I could tell he had a sincere
> compassion for the less fortunate as well as a desire to contribute his own time to
> helping others.  More than just providing financial support, he really wanted to
> help serve our cause with his personal time.  I can tell you from years of
> experience that it is much more difficult to find people to give their time than
> their money.

> Paul served as a Director on our Board beginning in 2011.  He served on our Nazi
> Victim Services committee, Gala Dinner Committee and has been ready to assist
> whenever called upon.  Specifically he has recruited new talent for Selfhelp's
> Board, convened colleagues to support Selfhelp and raise funds to advance our
> mission. . . .

I have seen Paul as a hard working results-oriented board member as well as a compassionate humanitarian, more concerned with the welfare of his fellow man than his own.  I'm confident that Selfhelp has benefited because of Paul's involvement and compassionate work.

(Stuart Kaplan.)

10.  Ohr Somayach

Ohr Somayach, a Jewish studies school (http://ohr.edu/), is a "world leader in Jewish outreach" and provides many different programs of study including teaching "basic Talmud skills to small groups," offering "individual counseling to young people at a crossroads in their lives," and working to "address the 'big picture' issues that so preoccupy college students in their quest for meaning."  (http://ohr.edu/ohr_somayach/about_ohr_somayach/.)  Mr. Konigsberg "was a generous benefactor" of this school, where he also studied.  (Jay Margolis.)  Jay Margolis, Mr. Konigsberg's mentor and teacher at the school, "found Paul to be deeply committed to his Jewish heritage of acts of virtue and charitable giving.  He . . . was the Guest of Honor at one of our annual dinners; giving a considerable amount of money and soliciting gifts for the school from his friends."

11.  Washington Institute for Near East Policy

The Washington Institute for Near East Policy was founded in 1985 "to inject the power of ideas and the discipline of scholarship into the making of U.S. Middle East policy" (http://www.washingtoninstitute.org/).  James Schreiber noted that Mr. Konigsberg "and his wife Judy have for many years also generously supported the work of a non-partisan D.C. based think tank focused on the Middle East--the Washington Institute for Near East Policy--whose sole mission is to assist the Executive branch of the U.S. government formulate and implement effective policies in the Region."

12.  Jewish Federation of Palm Beach County

Similar to the UJA-Federation of New York, Jewish Federation of Palm Beach County

(http://jewishpalmbeach.org/) is one of the leading centers for Jewish education, leadership, and

community in all of South Florida.  Following his move to Florida in 2014, Mr. Konigsberg has

sought to become more involved with this organization, which works to ensure "the future of the

Jewish people" and meet "their spiritual, cultural, educational, and social service needs."

(http://jewishpalmbeach.org/about/departments/ac/index.html.)  Mr. Konigsberg makes

charitable donations to Jewish Federation of Palm Beach County and volunteers his time for their

programs.[3]


13.  Inspiration to Others

Perhaps Mr. Konigsberg's most impressive accomplishment is that, through the example

of public service and charitable contributions that he set, he has inspired others to volunteer and

support their community as well.  "Paul Konigsberg set an example for others when it came to

supporting others less fortunate. . . . Paul did the work as well as the financial support."

(Lawrence Bass.)  Mr. Konigsberg "was incredibly charitable, loved by all who knew him, a

pillar in our world, and someone I looked up to."  (William Apfelbaum.)

Mr. Konigsberg's example and mentoring certainly affected Bert Brodsky; "[w]hen I first

met Paul I was not involved in any charities[,] but under Paul's mentoring and because of my

association with Paul[,] I supported and became active in many charitable organizations[.]"

---

[3]  When Mr. Konigsberg was asked to prepare a list of all his monthly living expenses for the Probation
Department, he included a sizeable payment to charity among his expenditures.  It never occurred to
him that this was not a necessary living expense (as the Probation Department informed him).  Larry
Field confirmed that Mr. Konigsberg "supports many organizations such as the U.S. Holocaust
Program at the University of Vermont, Jewish Federation of Palm Beach County, Jupiter Medical
Center in Jupiter, Florida, UJA-Federation of New York, Planned Parenthood, Israel Tennis Center,
and Morse Life Foundation in West Palm Beach, Florida."

(Bert Brodsky.)  Similarly, Joel Cooperman noted that Mr. Konigsberg "has taught me how important it is to give back and to help others less fortunate. . . . Through his mentoring and leadership, I believe I have become a better more compassionate, more charitable, more understanding person.  Paul is, in my opinion, someone who had made and continues to make a difference."  Paul Levinsohn told a similar story, in which Mr. Konigsberg both inspired him to give back, and also assisted Mr. Levinsohn in establishing a charitable foundation of his own:

> I am thankful that he has taken the time to show me how important it is to dedicate oneself to helping others and giving back.  Paul introduced me to two organizations that are doing a world of good for others.  The first non-profit, Selfhelp Community Services of New York City, is dedicated to maintaining the independence and dignity of seniors and at-risk populations through a spectrum of housing, home health care, and social services.  Paul served for years as a member of the Board of Directors of Selfhelp.  He introduced me to this wonderful organization and all the important work they do for New Yorkers and then helped bring me on as a fellow member of the Board of Directors.

> Paul has also been active for years in an organization called The Jewish Foundation for the Righteous, a non-profit that provides financial support to more than 600 non-Jews who rescued Jews during the Holocaust.  Again, Paul introduced me to this incredible organization and stressed to me how important it is to financially support its efforts.  I am honored that over the years Paul and I have sponsored and supported numerous righteous individuals throughout the world.

> Four years ago, Paul also encouraged my wife and me to establish a family foundation.  Paul set up the foundation, helped provide its structure, and guided us on organizations to support.  We chose Paul to serve as the Trustee of our foundation.  There is no one we trust more.

As Paul Kane concluded, Mr. Konigsberg is "one of the most gracious, giving, caring human beings" with whom he ever worked; he "is clearly a role model for all of us to emulate."

## III.  THE NATURE AND CIRCUMSTANCES OF THE OFFENSE

At his guilty plea, Mr. Konigsberg took "responsibility for what [he] did that was wrong."  (Transcript of June 24, 2014 Proceedings at 27, Dkt. No. 1090).  Mr. Konigsberg acknowledged that "[a]t certain times [he] agreed with people at Madoff's firm, which was a

broker-dealer and an investment advisor, and certain of his clients to return trading statements to them and then accept amended ones from them, which included new and changed securities transactions and that [he] used these amended statements to file tax returns." (*Id.*)  Mr. Konigsberg further stated that "[e]ven though [he] didn't know these new securities transactions never actually took place in the market, returning the original statements and using amended ones with new trades to file tax returns was wrong, and [he] knew it at the time." (*Id.* at 28.)

Specifically, Mr. Konigsberg described that, "[i]n 2003, client 2 and [he] were present in Manhattan at Madoff's firm when, in [his] presence, Annette Bongiorno changed client 2's trading statements for the tax year 2002 so that they showed a gain instead of a loss.  [He] later agreed to use those changed statements to file tax returns for client 2, which [he] signed in Manhattan before submission to the IRS in 2003.  [H]e knew Bongiorno's change of client 2's trading statements were wrong and [his] filing of the tax return based on them was wrong." (*Id.*) Mr. Konigsberg also allocated that "[i]n 2008, Madoff's firm asked [him] to return the trading statements of client 3 so that they could change them, and [h]e agreed and did return them.  Tax returns based on client 3's changed statements, however, were never filed following Madoff's arrest in December of 2008." (*Id.*)  Mr. Konigsberg stated that he "knew that returning client 3's trading statements to be changed by Madoff's firm was wrong." (*Id.*)

During his allocution, Mr. Konigsberg also described certain accurate and proper tax advice that he gave to Madoff in or about 1995.  It is important to emphasize that the advice Mr. Konigsberg provided was, in fact, accurate and proper.  What, if anything, Madoff and/or others did with that advice was beyond Mr. Konigsberg's control and/or knowledge.  Mr. Konigsberg stated during his allocution that:

> [I]n or about 1995, I provided accurate and proper tax advice to Madoff, advising
> him that transfers of money through CC1 and CC2 could be done as a gift, which

would be taxable to Madoff, or as a loan that would not be taxable so long as CC1 and CC2 paid the required interest on those loans and paid back the principal on those loans.  I then referred Madoff to a lawyer to prepare the loans.

On December 10th, 2008, the day before Madoff was arrested, Madoff called me out of the blue and asked whether these loans had been converted into gifts.  I responded that he never discussed the possibility of reclassifying the loans into gifts with me and that he should speak with his accountant, as I was not his accountant and, therefore, did not make those kind of decisions.

(*Id.* at 28-29.)  The government's 5K letter sets forth in detail the scope and nature of Mr. Konigsberg's conduct.

It is undisputed that Mr. Konigsberg did not know about Madoff's Ponzi scheme.[4]  Mr. Konigsberg could not even conceive for one moment that Madoff was engaged in a Ponzi scheme because, among other reasons, (1) Madoff convincingly held himself out to the world as a self-made billionaire who filed audited statements of financial condition (with which Mr. Konigsberg had nothing to do as he was not, and has never been, Madoff's accountant) attesting to his enormous wealth and success, (2) Madoff was widely respected for decades in the securities industry, having held senior positions within institutions at the heart of the United States financial establishment including service on committees to advise the Securities and Exchange Commission, serving as a former Chairman of NASDAQ, serving as a former Vice Chairman of the National Association of Securities Dealers, and serving as a former director of the U.S. Securities Industry Association, (3) Madoff was widely considered a genius in and among the Jewish community—most notably among Jewish charities—where, as described above, Mr. Konigsberg had dedicated much of his time, energy, and resources, and (4) Madoff

---

[4]   The government has acknowledged and agreed that Mr. Konigsberg "did not intend to assist Madoff in defrauding his customers through the Ponzi scheme," (Tr. of June 24, 2014 Proceedings at 31-32), and that, as an outsider, Mr. Konigsberg was "not necessarily privy to all aspects of Madoff's massive fraud – even, most fundamentally, the fact that the Madoff Securities investment advisory business was a Ponzi scheme" (PSR ¶ 39).

had brought his sons into the business after they had graduated from business school, and Mr. Konigsberg could not fathom any father bringing his own sons into a criminal enterprise.

In the context of analyzing the nature and circumstances of the conduct here, we respectfully submit that Mr. Konigsberg's lack of any inkling of Madoff's Ponzi scheme is notable and significant. Although Mr. Konigsberg has acknowledged and accepted responsibility for his actions, Mr. Konigsberg had nothing to do with the most diabolical and despicable aspects of Madoff's crimes. All crimes are serious and warrant serious consequences. But the conduct that makes Madoff the worst white collar criminal offender in history is not attributable to Mr. Konigsberg. Accordingly, the nature and circumstances of the offenses here should be distinguished and not tainted by what Madoff did. *See United States v. Studley*, 47 F.3d 569, 574 (2d Cir. 1995).

Finally, we respectfully note that Mr. Konigsberg has already forfeited all Madoff Securities funds derived from the Madoff-related clients for whom Konigsberg Wolf provided services over the course of 13 years—approximately $3.9 million—and Mr. Konigsberg receives credit for having done so in the Consent Preliminary Order of Forfeiture/Money Judgment.[5] (*See also* PSR ¶ 75.) As the government acknowledges, almost all of Mr. Konigsberg's business at Konigsberg Wolf was legitimate and had nothing to do with Madoff.[6] As discussed above, Mr.

---

[5] To provide a sense of the proportion of Madoff-related clients who were also Konigsberg Wolf clients serviced by Mr. Konigsberg, in July 2011 when he and his brother were preparing to sell their business to Citrin Cooperman, Mr. Konigsberg had over 750 clients for whom he was the Primary Partner. This largely excluded the clients who had accounts with Madoff Securities, but even assuming all of the approximately 20 clients with investment accounts at Madoff Securities (and for whom Mr. Konigsberg was the accountant) were still clients of Mr. Konigsberg in July 2011, that would still only amount to 2.7% of Mr. Konigsberg's clients. The percentage becomes even smaller when one includes all of Konigsberg Wolf's clients.

[6] *See* 5K letter at 10 ("Konigsberg enjoyed a successful career in his own right, building and running an accounting firm where the vast majority of clients had no association whatsoever with Madoff or BLMIS.").

Konigsberg's father founded the business in or around 1936.  Mr. Konigsberg joined the business

in or around 1966, and with his brother built the firm up over the course of almost 40 years.  Mr.

Konigsberg and his business made a lot of money (indeed, millions of dollars) over those 40

years through diligent, legal, hard work,[7] and there is no allegation that any of that business or

income is associated in any way with Madoff, Madoff Securities, or the conduct underlying Mr.

Konigsberg's offenses in this case.

## IV.  A NON-GUIDELINES SENTENCE OF TIME SERVED IS APPROPRIATE

The Presentence Report calculates Mr. Konigsberg's advisory Guidelines sentence.[8]  We

respectfully ask the Court to sentence Mr. Konigsberg to a non-custodial sentence of time served

---

[7]  *See* PSR ¶ 125 (at its peak, Konigsberg Wolf had gross annual earnings of approximately
$20 million).

[8]  Mr. Konigsberg notes that, in paragraphs 75 and 88 of the Presentence Report, he is being held
accountable for certain losses.  Under section 1B1.3 (a)(1)(A)-(B) of the Sentencing Guidelines, Mr.
Konigsberg's guidelines calculation must be based only on conduct that is both in furtherance of the
criminal activity jointly undertaken by him, and reasonably foreseeable in connection with that
criminal activity.  United States Sentencing Commission, *Guidelines Manual*, § 1B1.3 (a)(1)(A)-(B)
(Nov. 2014); *see also* Commentary to USSG § 1B1.3, n.2 ("The conduct of others that was not in
furtherance of the criminal activity jointly undertaken by the defendant, or was not reasonably
foreseeable in connection with that criminal activity, is not relevant conduct under this provision.");
*United States v. Studley*, 47 F.3d 569, 574-75 (2d Cir. 1995) (same).  In addition, the Commentary to
the Guidelines states, in sum and substance, that "actual loss" is pecuniary harm that the defendant
knew or, under the circumstances, reasonably should have known, was a potential result of the
offense.  Commentary to USSG § 2B1.1, n.3(A)(i), (iv).

We submit that it was not reasonably foreseeable that "the criminal activity jointly undertaken by"
Mr. Konigsberg would lead to any loss amount, and it was likewise not reasonably foreseeable that
the attributed losses were "a potential result of the offense."  When the investment account statements
were altered, Mr. Konigsberg was told that his clients were being given transactions that had occurred
in Madoff's personal accounts – there was no suggestion that the money was being taken from other
investors.  The Government agrees that Mr. Konigsberg "did not intend to assist Madoff in defrauding
his customers through the Ponzi scheme."  (Tr. of June 24, 2014 Proceedings at 31-32.)  Without
knowledge of or intent to assist the Ponzi scheme, it was not reasonably foreseeable that any losses
were a potential result of the offense of altering account statements that, in substance, purportedly
transferred in-the-money securities transactions from Madoff's personal accounts to Mr.
Konigsberg's clients.

To the extent that the Court considers the attributed loss amount in determining Mr. Konigsberg's
sentence, we submit that the unforeseeable nature of the losses at the very least justifies a significant

*(Cont'd on next page)*

with no fine and no further time for supervised release based on the factors set forth in Title 18, United States Code, Section 3553(a), and Mr. Konigsberg's substantial cooperation with the government.

## A.    The Factors in 18 U.S.C. § 3553(a) Support a Sentence of Time Served

Although calculating the applicable Guidelines range is the required first step in the sentencing process and a factor to be considered in determining the appropriate sentence, following *United States v. Booker*, 543 U.S. 220 (2005), the Guidelines are advisory only, and the Court "'may not presume' the reasonableness of the Commission's Guidelines sentencing range[.]" *United States v. Jones*, 531 F.3d 163, 182 (2d Cir. 2008) (quoting *Gall v. United States*, 552 U.S. 38, 50 (2007)).  "Rather, in every case, the district court 'must make an individualized assessment' of the appropriate sentence 'based on the facts presented' and the factors detailed in § 3553(a)." *Id.* (quoting *Gall*, 552 U.S. at 50).  Importantly, "'the punishment should fit the offender and not merely the crime.'" *Pepper v. United States*, 562 U.S. 476, 487-88 (2011) (quoting *Williams v. New York*, 337 U.S. 241, 247 (1949)).

Title 18, United States Code, Section 3553(a), "as modified by *Booker*, contains an overarching provision instructing district courts to 'impose a sentence sufficient, but not greater than necessary,' to accomplish the goals of sentencing." *Kimbrough v. United States*, 552 U.S. 85, 101 (2007) (quoting 18 U.S.C. § 3553(a)).  As discussed below, an assessment of the factors specified in section 3553(a) demonstrates that a sentence of time served with no fine and no term

---

*(Cont'd from previous page)*

   variance from the advisory Guidelines sentence, such that Mr. Konigsberg should receive a non-custodial sentence with the agreed $4.4 million forfeiture and no additional fine.

of supervised release is both just and appropriate in these circumstances.[9]

1. The Nature and Circumstances of the Offense and the History and Characteristics of the Defendant

Mr. Konigsberg has acknowledged and accepted responsibility for his past actions.  In weighing the nature and circumstances of the offense, we ask the Court to place his conduct in context and consider the following points.  First, Mr. Konigsberg had no inkling in any way, shape, or form about the Ponzi scheme.  Second, Mr. Konigsberg did not know that the securities transactions were phony and nonexistent.  He and his family had money invested in Madoff's firm, and he believed Madoff was a genius who had actually invested and managed his clients' money in the markets.  Third, Mr. Konigsberg never worked at Madoff Securities and he was never an accountant for Madoff or his firm;[10] he was an outsider who performed accounting services for certain clients who had invested in Madoff Securities.

Frederic Konigsberg, Mr. Konigsberg's youngest brother (12 years his junior) noted that "my family has been personally devastated by the Madoff fraud, losing substantial assets which I know [weighs] heavily upon Paul."  Richard Leder, a childhood friend of Mr. Konigsberg who attended college and law school with him and still remains a close friend to this day, stated in his sentencing letter:

> I am a Madoff victim.  I had a modest sum of money to invest in 1988.  I wanted to invest it with Madoff based on his reputation for solid returns, but knew it was far below the minimum investment that Madoff would require.  I asked Paul if he could help me.  As always, when I needed a favor, Paul came through.  I kept the Madoff account for 20 years and never withdrew any of it.  Paul and I discussed

---

[9]   The factor noted in section 3553(a)(2)(C) ("protect the public from further crimes of the defendant") is not discussed because, we respectfully submit, it is inapplicable.  Mr. Konigsberg is retired.  The Second Judicial District has moved to strike Mr. Konigsberg's name from the Role of Attorneys, and Mr. Konigsberg's CPA license has lapsed and is no longer registered.  Mr. Konigsberg does not represent a continuing threat to anyone.

[10]   *See* Tr. of July 24, 2014 Proceeding at 33 (government acknowledged that Mr. Konigsberg "was not Madoff's accountant.").

> our Madoff accounts on a number of occasions.  It is clear to me beyond
> peradventure of doubt that he had no knowledge whatsoever of Madoff's
> activities, and trusted him like the rest of his investors did.  Obviously, if that was
> not true, I wouldn't be writing this letter.

Similarly, William Apfelbaum, Bert Brodsky, and Mark Green are all Madoff victims, and have

nonetheless written letters in support of Mr. Konigsberg.  (William Apfelbaum; Bert Brodsky;

Mark Green.)

As Your Honor has noted in sentencing other individuals in the past, the Court takes into

account an individual's lifetime of actions, and not just those that led to his or her guilty plea and

sentencing.  As Judge Rakoff has similarly stated:

> [S]urely, if ever a man is to receive credit for the good he has done, and his
> immediate misconduct assessed in the context of his overall life hitherto, it should
> be at the moment of his sentencing, when his very future hangs in the balance.
> This elementary principle of weighing the good with the bad, which is basic to all
> the great religions, moral philosophies, and systems of justice, was plainly part of
> what Congress had in mind when it directed courts to consider, as a necessary
> sentencing factor, "the history and characteristics of the defendant."

*United States v. Adelson*, 441 F. Supp. 2d 506, 513-14 (S.D.N.Y. 2006).  When Mr.

Konigsberg's conduct in this case is weighed against the good he has done over the course of a

lifetime, we respectfully submit that a sentence of time-served with no fine and no further term

of supervised release is warranted.

Mr. Konigsberg has been a compassionate and generous patriarch, embracing and

supporting not only his immediate and extended family, but his friends and neighbors, his

employees, his clients, his colleagues, and many others who he has encountered along the way.

He has been a pillar in the community for decades—readily volunteering both his time,

compassion, and money to numerous organizations that provide for those less fortunate, pioneer

groundbreaking medical research, contribute to our cultural education and awareness of events

like the Holocaust, and support both local and global communities of every kind.  He has

provided financial and emotional support and guidance to countless individuals over the years without expecting anything in return—he did it, simply, because each of these individuals had a need, he had the ability to fulfill it in some way, and it was the right thing to do.  And through his example, he inspired others to give back to their communities, further extending the reach of his positive influence in this world.

Many people who have written letters in support of Mr. Konigsberg have echoed a plea to balance Mr. Konigsberg's wrongdoing against a lifetime of good deeds, emphasizing that his conduct here is not representative of Mr. Konigsberg's true nature.  Rabbi Joseph Potasnik noted that, "I have often felt that no person's life should be defined by one chapter, but rather by the accumulation of many good deeds during a lifetime."  Robert Katz similarly observed, that, "[a] mistake in judgment should be considered along with his many years of good deeds for employees and organizations he helped."  Domenick Esposito, a professional acquaintance of Mr. Konigsberg for almost 30 years, wrote that, "I have always admired Paul's character, generosity and willingness to help others. . . . I know Paul has made a mistake here.  It's very unfortunate[,] but we all make mistakes.  I truly hope that his entire contribution to society is taken into account."  Allen Spiegel, Dean of Einstein College of Medicine, stated that, "as someone who has observed him over the years, and been impressed with his commitment to be of service to society, I would add my voice to what I am sure will be others asking you to take his positive contributions into consideration."

Jay Margolis, Mr. Konigsberg's teacher and mentor at the Jewish studies school, Ohr Somayach, offered instruction from Judaism:

> I know from life experience the truth of Rabbi Yisroel Salanter's (18th century) observation:  "There is a huge gap between knowing what is right and not knowing.  There is a greater gap between knowing what is right and being able to consistently practice it."

41

> I am sorry for my friend's predicament.  I always found him to be a man whose kindness, generosity, and genuineness were exemplary.  I hope you will be merciful in your judgment in dealing with a good man who knows what is right and may have slipped in the consistency of his practice.

Finally, Isaac Lamm, an employee of Mr. Konigsberg, offered the following request:

> All that we have heard or read about this case stands in stark contrast to the man who has done so much good with his life. . . .
>
> If against the backdrop of a life lived as beautifully as Paul's, some mistakes were made; if in the midst of a life filled with so much integrity, respect, and kindness, some poor judgment was shown, then, Your Honor, we ask that the mistakes and poor judgment be viewed as just that–mistakes and poor judgment.
>
> Paul has lived a life that has benefited and continues to benefit so many people.  Paul's current pain is shared by all of us – his friends, his family, his community and everyone whose life he has been touched by this very special person.  And so, Your Honor, we ask that you please have compassion on us all.

For all these reasons, Mr. Konigsberg's history and characteristics strongly support a sentence of time served with no fine and no further term of supervised release in this case.  *See* 18 U.S.C. § 3553(a)(1).

Mr. Konigsberg plans to continue his community service and charitable works even if the Court does not impose a further term of supervised release.  However, although we do not believe it is necessary, should the Court impose a further period of supervised release, Mr. Konigsberg would welcome a community service component.  His commitment to public service and charitable work remains as strong as ever.  As Paula Iacovissi, an employee of Mr. Konigsberg, stated, "[h]e is a good person with a very generous heart who is a more valuable free citizen in the good he can continue to do than if sentenced to prison."  Arnold Cohen, a childhood friend and later business competitor of Mr. Konigsberg, similarly noted that, "I hope you get some insight into this wonderful man and can see your way clear to giving him another chance to give back, from someone who has such strong attributes."  Joseph Fierro, another former employee of Mr. Konigsberg, agreed that "[h]e is a good person who is more valuable to

society as a free citizen than if sentenced to prison."  As Bert Brodsky, one of Mr. Konigsberg's

clients and friends, concluded, "justice would be better served if [Mr. Konigsberg] remained a

part of the community and would be able to continue the good works he has practiced throughout

his life."

    2.   <u>The Need for the Sentence Imposed to Reflect the Seriousness of the Offense, to
Promote Respect for the Law, to Provide Just Punishment for the Offense, and to
Afford Adequate Deterrence to Criminal Conduct</u>

    Mr. Konigsberg has acknowledged responsibility for his past actions and cooperated with

the government, providing substantial assistance.  When this is considered in combination with

the repercussions from Mr. Konigsberg's offense that have already taken place in his personal,

business, and charitable communities, we respectfully submit that Mr. Konigsberg has been

justly punished and that his case will serve as a serious deterrent to others.  Mr. Konigsberg has

already been severely punished by the damage to his sterling reputation, his forced retirement,

and his loss of his many philanthropic pursuits as a result of these proceedings.  This alone is

significant deterrence for others.  Accordingly, a sentence of time served is sufficient to serve the

statutory purposes laid out in 18 U.S.C. § 3553(a)(2)(A) – (B).

    Mr. Konigsberg is 79 years old.  He and his brother had to sell their business in 2011 and

thereafter retire as a result of media accounts relating to Mr. Konigsberg's association with

Madoff.  (PSR ¶ 125; Joel Cooperman.)  He no longer holds a CPA license, and his name is in

the process of being stricken from the Second Judicial District's Role of Attorneys.  (PSR

¶¶ 110, 122.)  In addition, as a result of this case, he has resigned or stepped down from the

numerous Board positions with various charitable organizations that he previously served—some

for decades.  (Abraham Goldner.)  Others have respectfully suggested that Mr. Konigsberg "has

suffered considerable punishment already by losing his professional licenses and status in the

accounting and business communities."  (Robert Katz.)  "The punishment that he has endured

emotionally since 2008 and the fact that Paul may have lost credibility in the public eye is a significant punishment for Paul, and I believe he is truly despondent regarding what he has put his family and friends through."  (Paula Iacovissi.)  "Paul has lost social status, money, people he thought were friends, professional licenses, clients and more."  (Abraham Goldner.)

Mr. Konigsberg's family has similarly noted the significant impact this case has had on him.

> Paul has tried to be strong for all of us and to focus on the many blessings in his life but this horrible ordeal has taken its toll. . . . So much has been taken from him already.  He will never get back his reputation, the many friends lost, and his career, which brought him so much stimulation and sense of purpose.

(Allison Feldman.)

> Paul's life will never be the same and he will forever be [scarred] by the events of the Madoff crime. . . . Paul has already suffered immensely having been publicly disgraced in the eyes of many of his peers; loosing his CPA license and his license to practice law; being unable to walk into a room and not feel that people are talking ill of him[;] and watching me and my family continue to suffer from Madoff's crimes.

(Frederic Konigsberg.)

> [I]t has been extremely hard to watch the toll the Madoff scandal has taken on Paul and his reputation.  Paul spent the majority of his life building a successful accounting practice by working hard, providing strong accounting expertise, and by being someone clients felt a deep sense of trust in based on Paul being an honorable individual.  In my opinion, Paul has more than paid the price, financially and reputation-wise, for any mistakes he has made.  There have been many times throughout the past 5 years where I have truly worried about Paul's physical and mental health.

(Matt Feiner.)

> Along with the loss of his livelihood, my dad has lost his circle of friends, and business acquaintances, which for my dad, at 79 years old, may be the most painful loss. . . . These past 6 years have been an extremely sad and frustrating time for my father.  My dad loved interacting with his peers, and he loved talking business.  I used to visit him at work, where he was in his element.  He had so much energy and passion for that job.  He would always introduce his colleagues to me as "Jeffrey, I want you to meet my good friend ...."

(Jeffrey Konigsberg.)

Over the last seven years, I have watched the emotional transformation of my husband.  He went from being the happy-go-lucky guy with something like 60 best friends to the depressed and often isolated man I know today.  He ██████ ██████ and is trying to regain some of the spirit he lost due to the scarring of his reputation, a forced early retirement, and the loss of life as we knew it.

(Judith Konigsberg.)

Mr. Konigsberg's physician confirmed that "due to recent circumstances, [Mr. Konigsberg] has required treatment ████████████████." (Amir Lubarsky, M.D.)  As his ████████ explained:



██████████████████████████████████████████

(Bruce Shapiro, M.D.)  As this insight into Mr. Konigsberg's psyche demonstrates, regardless of the sentence imposed by this Court, the impact that this case has had, and will continue to have on Mr. Konigsberg's professional, personal, and charitable endeavors represents extensive punishment.  *See United States v. Stewart*, 590 F.3d 93, 141 (2d Cir. 2009) (the "need for further deterrence and protection of the public is lessened because the conviction itself already visits substantial punishment on the defendant").

3.  The Need for the Sentence Imposed to Provide the Defendant with Needed Medical Care in the Most Effective Manner

To the extent this factor pursuant to 18 U.S.C. § 3553(a)(2)(D) is applicable, it supports a non-custodial sentence.  Mr. Konigsberg is 79 years old, and has several health conditions that require consistent treatment.  Mr. Konigsberg suffers from ████████████████████, he has been treated for ████████████████, he "suffers from ████████ ████████████████," and he has ████████████████.  (PSR ¶ 111.)  A non-custodial sentence of time served will permit Mr. Konigsberg to remain under the treatment of his current physicians who are familiar with his conditions and thus maintain a continuity of care as Mr. Konigsberg gets increasingly older.  This would be the most effective manner in which to ensure Mr. Konigsberg receives his necessary medical care.  *See also* United States Sentencing Commission, *Guidelines Manual*, § 5H1.1 (Nov. 2014) ("USSG") ("Age may be a reason to depart downward in a case in which the defendant is elderly and infirm and where a form of punishment such as home confinement might be equally efficient as and less costly than incarceration.").

4.   The Need to Avoid Unwarranted Sentence Disparities Among Defendants with Similar Records Who Have Been Found Guilty of Similar Conduct

Mr. Konigsberg's role in the instant offense is unique from the rest of his codefendants, in that Mr. Konigsberg was an outsider to Madoff Securities.  In addition, unlike others who went to trial or only pleaded guilty, Mr. Konigsberg accepted responsibility for his crimes, pled guilty, and agreed to cooperate with the government—providing substantial assistance over the course of his cooperation.

As an outsider, Mr. Konigsberg did not have any insight into the day-to-day operations of Madoff Securities.  Thus, "to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6), Mr. Konigsberg's sentence should be no more severe than those of his codefendants—all insiders at Madoff Securities—who pled guilty and cooperated with the Government.  The codefendants in Mr. Konigsberg's case who pled guilty, cooperated with the Government, and have been sentenced to date have all received non-custodial sentences.  (*See* Dkt. Nos. 1348, 1349, 1356, 1357.)  This further supports the reasonableness of a sentence of time served with no fine and no further term of supervised release for Mr. Konigsberg.

Even in pre-*Booker* cases, white collar defendants who pled guilty and provided substantial assistance to the Government have received non-custodial sentences.  For example, in *United States v. Feeny*, the defendant was a line broker who pled guilty to conspiracy and securities fraud charges for his role in a "boiler room" operation.  No. 00 Cr. 91-09, 2002 WL 31426024, at *1 (S.D.N.Y. Oct. 28, 2002).  Acknowledging the substantial assistance the defendant provided to the Government, the court sentenced him to three years of supervised release on each count, to run concurrently.  *Id.* at *12.  Similarly, in *United States v. Senesey*, the defendant pled guilty to one count of conspiracy to commit bribery and mail fraud.  No. 94 Cr.

290-01, 1997 WL 187345, at *1 (Apr. 15, 1997).  Taking into consideration the defendant's

substantial assistance to the Government as well as the fact that he was elderly and seriously

infirm, the court sentenced him to five years of probation.  *Id.* at *2.

Finally, the fact that the Probation Office—with its knowledge of both Mr. Konigsberg's

codefendants in this case and other white collar defendants generally—recommends a non-

custodial sentence of time served in the Presentence Report (PSR at 34) further supports that a

sentence of time served will properly avoid unwarranted sentence disparities.

5.   The Need to Provide Restitution to Any Victims of the Offense

Mr. Konigsberg and the Government have agreed to a Consent Preliminary Order of

Forfeiture/Money Judgment which was submitted to the Court on June 25, 2015.  (Dkt. No.

1386.)  Pursuant to its terms, Mr. Konigsberg has agreed to forfeit $4,400,000[11] which represents

"the amount of proceeds derived from or traceable to the offenses charged in Counts One and

Two of the Information."  (*Id.* at 2.)  Mr. Konigsberg respectfully submits that this $4.4 million

forfeiture amount fully and completely encompasses any and all payments that Mr. Konigsberg,

his relatives, and his business ever received from Madoff and Madoff Securities, and then some.

Based on this substantial forfeiture, Mr. Konigsberg further submits that it would be

inappropriate to impose any further forfeiture or fine.

**B.   Mr. Konigsberg's Cooperation Warrants a Significant Departure from the Guidelines**

As detailed in the government's letter, Mr. Konigsberg voluntarily participated in four

lengthy proffer sessions with the government beginning in October 2012 in which he candidly

admitted and described in detail his own unlawful conduct, and "disclosed facts vital to

investigations of others."  Mr. Konigsberg was able to provide information to the government

---

[11]   Mr. Konigsberg and the Government have agreed that any amount, up to $4,100,000, paid by Mr.
Konigsberg to the SIPA Trustee shall be credited toward this amount.

that corroborated and supplemented evidence from other individuals, supplied important context and insight to assist the government in assessing the culpability of others, and furnished insight into the relationships and financial dealings between Madoff and those close to him.

Section 5K1.1 of the Sentencing Guidelines provides five nonexclusive factors that the Court may consider in determining the appropriate sentence reduction where a defendant has provided substantial assistance to the government.  These factors are:

(1) the court's evaluation of the significance and usefulness of the defendant's assistance, taking into consideration the government's evaluation of the assistance rendered;

(2) the truthfulness, completeness, and reliability of any information or testimony provided by the defendant;

(3) the nature and extent of the defendant's assistance;

(4) any injury suffered, or any danger or risk of injury to the defendant or his family resulting from his assistance;

(5) the timeliness of the defendant's assistance.

USSG § 5K1.1(a).  As detailed in the government's letter, Mr. Konigsberg's cooperation with the government was substantial, truthful, complete, and reliable.  In addition, the information Mr. Konigsberg provided was useful in many different aspects of the government's investigation and prosecution, including with respect to charging decisions.  Although it understandably took Mr. Konigsberg some time to come to grips with the import of his conduct and take responsibility for his actions, his cooperation was useful to several aspects of the government's investigation and prosecution.  And, finally, the government has recognized that Mr. Konigsberg's cooperation "came with a heavy price" that included selling his business, giving up his CPA license and license to practice law, and stepping down from the leadership of the many charitable organizations to which he had devoted substantial time and personal commitment.  Although Mr. Konigsberg fully acknowledges the conduct that led to these consequences, they have

nonetheless been "undeniably painful" for Mr. Konigsberg and those close to him.

Given that Mr. Konigsberg's cooperation has taken place behind the scenes, it is appropriate for the Court to take guidance from the government's assessment of Mr. Konigsberg's cooperation.  *See* Commentary to USSG § 5K1.1, n.3 ("Substantial weight should be given to the government's evaluation of the extent of the defendant's assistance, particularly where the extent and value of the assistance are difficult to ascertain.").

We respectfully submit that the substantial assistance described in the government's letter to the Court, coupled with Mr. Konigsberg's otherwise exemplary life of uncommon compassion, generosity, and service to those less fortunate, warrants a sentence of time served with no fine or further period of supervised release.

## CONCLUSION

For the foregoing reasons, we respectfully request that the Court impose a non-Guideline sentence of time served with no fine or further period of supervised release upon Paul Konigsberg.

Respectfully submitted,

July 1, 2015

GIBSON, DUNN & CRUTCHER LLP

Reed Brodsky
Darcy C. Harris
200 Park Avenue
New York, N.Y.  10166
Tel:  (212) 351-4000
Fax:  (212) 351-4035

*Attorneys for Defendant Paul J. Konigsberg*

50