**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

---

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

July 2, 2015

**BY ECF**

Honorable Laura Taylor Swain
United States District Judge
Southern District of New York
500 Pearl Street, Suite 755
New York, New York 10007

> Re:  *United States* v. *Paul J. Konigsberg*
> No. S12 10 Cr. 228 (LTS)

Dear Judge Swain:

Paul J. Konigsberg is scheduled to be sentenced by Your Honor on July 9, 2015, at 2:00 p.m.  The Government respectfully submits this letter to advise the Court of the pertinent facts concerning the assistance that Konigsberg rendered in the investigation and prosecution of other persons.

As the Court knows and Konigsberg admitted during his plea proceeding, Konigsberg was a culpable participant in aspects of the largest financial fraud in history.  He was a lawyer and accountant who provided services to numerous clients of Bernard L. Madoff Investment Securities ("Madoff Securities" or "BLMIS"), and was an informal tax and business adviser to Madoff personally.  Konigsberg bears responsibility for the falsification of, among other records, investor account statements.  Although Konigsberg was unaware of the Ponzi scheme being run out of Madoff Securities, his criminal conduct was undeniably significant.

Less well known is that Konigsberg, through his work as a cooperating defendant, has provided valuable assistance to the Government on a variety of fronts.  In proffer sessions beginning in October 2012, he admitted his own bad acts, including self-incriminating details that the Government likely would not have otherwise discovered.  He also disclosed facts vital to investigations of others.  Konigsberg did not plead guilty until June 2014.  Accordingly, the value of his cooperation before that point came only in the form of investigative leads or corroboration.  Following his guilty plea, however, Konigsberg was available and willing to testify as needed.  That he has not been called to do so is attributable to factors beyond his control, not to any doubts the Government harbored about the truth, reliability, or importance of his potential testimony.  Konigsberg remains willing to assist; he has agreed to continue cooperating with the United States Attorney's Office and any law-enforcement agency it designates as a condition of any term of supervised release imposed by the Court.

In light of these facts, and assuming that Konigsberg continues to comply with the terms of his cooperation agreement and commits no additional crimes before sentencing, the Government intends to move at sentencing, pursuant to Section 5K1.1 of the Sentencing Guidelines and 18 U.S.C. § 3553(e), that the Court sentence him in light of the factors set forth in Section 5K1.1(a)(1)-(5) of the Guidelines.

## A.      Background and Criminal Conduct

Paul J. Konigsberg is 79 years old.  He attended the University of Vermont and New York University, earning a degree in Accounting, then received a law degree from Brooklyn Law School in 1961 and a Masters of Law in Taxation from New York University School of Law in 1965.  In his 30s, Konigsberg became a Certified Public Accountant and joined what came to be known as Konigsberg Wolf & Co., P.C. ("KW"), an accounting, tax, and consulting firm in New York, New York.  Konigsberg became a senior tax partner at KW, and ultimately took over the business along with his brother.  He remained at KW until late 2011 or early 2012, when he sold the business to the Manhattan-based accounting firm Citrin Cooperman.  By that point, KW employed approximately 45 people.

In the 1970s, Konigsberg met and came to know Bernard L. Madoff.  Although Madoff had no connection, directly or indirectly, with much of Konigsberg's or KW's business over the decades, he directed significant business and other benefits Konigsberg's way.  When Konigsberg needed additional money to complete his purchase of a house, Madoff loaned him approximately $300,000.  Konigsberg paid back the loan within approximately two months, but Madoff did not charge him interest, telling him to consider it a gift.  Madoff also asked Konigsberg to help set up Madoff Securities International Limited ("MSIL"), BLMIS's London-based affiliate.  Konigsberg did bookkeeping for MSIL and initially received a 4% interest in the entity in lieu of a fee, making him the only person outside Madoff's family to own equity in a Madoff entity.  But Konigsberg soon advised Madoff to hire a London accounting firm to handle the bookkeeping, and by the 1990s, Konigsberg had no active role in MSIL's operation.  His stake in MSIL became merely an investment, and not a profitable one.  The stake became diluted over time—by July 2008, Konigsberg held roughly .0002% of the entity's total outstanding shares—and never generated any actual income for Konigsberg.

Beginning in at least the early 1990s, Madoff began to steer certain Investment Advisory ("IA") clients toward Konigsberg's accounting practice.  By December 2008, when BLMIS collapsed and its long-running Ponzi scheme was revealed, KW was providing accounting services for Madoff Securities clients who aggregately held more than 300 IA accounts, including many of BLMIS's longest-running and most important clients.  From that group, Konigsberg personally served as the accountant for approximately 20 clients who held an aggregate of approximately 100 IA accounts.  The clients represented some of BLIMS's, though not necessarily Konigsberg's or KW's, biggest customers.

Konigsberg's position gave him unique insight into how BLMIS managed certain accounts.  In 1995, Konigsberg inherited the accounts of one of BLMIS's biggest investors, whom the Statement of Facts accompanying the Government's January 6, 2014 Deferred Prosecution Agreement ("DPA") with BLMIS's primary bank, JPMorgan Chase Bank, identified

as the "Private Bank Client."[1] Bank statements Konigsberg received reflected tens of millions of dollars in "round-trip" transactions occurring daily in BLMIS's and the Private Bank Client's accounts. Unable to discern what purpose these transactions served,[2] Konigsberg advised Madoff and the Private Bank Client to cease that activity. But the activity continued, with Madoff telling Konigsberg that the transactions related to an arrangement he had worked out with the Private Bank Client.

Madoff and others at BLMIS executed glaringly fraudulent transactions in the accounts of certain Konigsberg clients, some of whom had been guaranteed specific rates of investment returns and/or annual commission payments for recruiting other investors to Madoff Securities. Co-conspirators often executed backdated transactions they referred to as "schtup" trades, in most cases purportedly executed in the last month of the year, to generate promised returns.

One example involved a longtime BLMIS account-holder identified in the information to which Konigsberg pled guilty (the "Information") as "Client-1."[3] After Client-1's death in or about 1994, Madoff persuaded Client-1's widow to use Konigsberg as her accountant. Because Client-1 had recruited investors to BLIMS, Madoff had promised him annual commission payments and a guaranteed rate of return. Madoff honored that promise after Client-1's death, making the payments through fictitious, backdated trades in the widow's account. BLMIS sent monthly statements for Client-1's IA accounts directly to KW. Madoff and Frank DiPascali devised an investment "strategy" whereby Client-1's accounts "invested" in Treasury bonds and cash equivalents for the first 11 months of every year. Each December, Konigsberg communicated with DiPascali about how much more the accounts needed to generate the guaranteed returns and commission. Then, in January, DiPascali fabricated backdated options trades into the December statements in order to produce the desired results. As a result, the account statements for December reflected trading activity unlike any that had occurred during the previous 11 months. In 2003, for example, account statements from January through November listed investments solely in U.S. Treasury bonds and money market funds, with a total account value at the end of November of approximately $860,000. In contrast, the December statements reflected four transactions that netted some $825,000 in additional funds. Konigsberg received the December 2003 statement for the Client-1 account in January 2004, and used it to prepare Client-1's widow's tax return.

For some accounting clients who had BLMIS IA accounts, Konigsberg conspired with others at BLMIS to use fake, backdated IA statements. From time to time, Madoff and certain of his employees "amended" the holdings of some of his oldest clients, replacing statements reflecting one set of securities with revised statements, for the exact same time period, reflecting entirely different holdings and values. The existence of multiple, vastly different account statements for the same time risked exposing the fraud. Accordingly, Madoff and his co-

---

[1] ███████████████████████████████████

[2] As set forth in the Statement of Facts accompanying the JPMorgan DPA, this activity resembled a massive check-kiting scheme.

[3] ████████████████████████

conspirators could ask only certain trusted clients—and Konigsberg—to return their statements in favor of the "amended" ones.  Konigsberg frequently complied with these requests.

Konigsberg was physically present when Annette Bongiorno and a client identified in the Information as "Client-2"[4] revised an entire year's worth of transaction activity.  Bongiorno handled Client-2's IA account at BLMIS.  In or around early 2003, Bongiorno asked Konigsberg to meet her and Client-2 in Bongiorno's office on the 17th floor of BLMIS in order to "rectify" an issue with Client-2's account.  Konigsberg had already reviewed Client-2's 2002 financial statements while preparing Client-2's tax return for that year.  He had also informed Client-2 that his IA account and other investments had performed poorly in 2002, draining much of Client-2's wealth.  At the meeting at BLMIS, Bongiorno and Client-2 informed Konigsberg that Madoff wanted to make things better for Client-2 and had therefore authorized Bongiorno to transfer assets from Madoff's own portfolio into Client-2's account.  Rather than accomplish this transfer by simply moving assets from Madoff's account to Client-2's, Bongiorno created a year's worth of new, backdated account statements, as if the securities had been transferred to Client-2 previously.  Konigsberg remained in Bongiorno's office as she altered Client-2's IA account statements from 2002, repopulating them with buys and sells of securities.  The new statements reflected activity dramatically different—and far more profitable—than what Konigsberg knew to have been there previously.  Konigsberg used the information in these new statements to prepare Client-2's 2002 tax return.[5]

A similar event unfolded in 2008 with respect to another longtime BLMIS IA client who used Konigsberg as his accountant, who is identified in the Information as "Client-3."[6]  Konigsberg witnessed a conversation in which Madoff and Client-3 discussed a $1.6 million debt Client-3 owed to Madoff.  Subsequently, Bongiorno asked Konigsberg to return Client-3's account statements for earlier in 2008.  She then sent Konigsberg "amended" statements reflecting vastly different activity in Client-3's account for the same period.  Madoff was arrested later that year, and Konigsberg never prepared tax returns for Client-3 based on the amended statements.

Bongiorno's own notes reflect communications about another Konigsberg client ("Client-4")[7] whose BLMIS account statements had been backdated, apparently for tax purposes, to reflect different trades.  In a note from late April 2003, Bongiorno wrote, "Paul will call to give me a loss # to put thru last Day in Dec.  Trade to settle beg of Jan 03."  An attached worksheet

---

[4] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

[5]  The sudden profits exposed Client-2 to an additional tax liability, but Bongiorno subsequently "executed" trades producing short-term losses to minimize those adverse tax consequences.  A note from Client-2 to Konigsberg dated April 27, 2003 stated, "Paulie Dear, Here is a copy of note on details I worked with Annette.  Both Bernie & Annette are aware of problems we have.  June is target for action."  Bongiorno generated the short-term losses in Client-2's account in June 2003.

[6] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

[7] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

with "Paul" and Client-4's name in its title listed various trades to be reflected as having occurred December 30 and 31.  The worksheet contained a handwritten notation by Bongiorno in the margin: "Paul OK'd this.  I will run on Monday."

The dozens of clients Madoff referred to Konigsberg paid Konigsberg or KW for the accounting services they received.  KW nevertheless received monthly payments of $15,000 to $25,000 from BLMIS directly from the mid-1990s until the collapse of Madoff Securities in 2008.  From 1992 to 2008, BLMIS also provided a $20,000 annual salary to one of Konigsberg's relatives, identified in the Information as "Relative-1,"[8] who, in fact, did not work at BLMIS during that period.  In approximately 1992, when Madoff was dealing with the collapse of Avellino & Bienes and restructuring his arrangements with the other original "feeders" to Madoff Securities, Madoff told Paul Konigsberg he wanted to pay him a commission of some $20,000 annually because Konigsberg had been recruiting customers to invest with BLMIS. Konigsberg initially refused the money, but Madoff insisted, so Konigsberg suggested that Madoff simply send the payments to Relative-1.  As Konigsberg explained to Madoff, Relative-1 had previously worked at BLMIS for a summer during college, so Madoff could pay Relative-1 through the BLMIS payroll.

Although he was neither Bernard Madoff's nor BLMIS's accountant, Konigsberg occasionally provided tax and business advice to Madoff personally.  Konigsberg advised Madoff about tax implications of transferring large sums of money directly to two other employees of Madoff Securities, whom the Information identifies as "CC-1" and "CC-2."[9] Specifically, Konigsberg advised Madoff of the tax implications of structuring the transfer as a loan (which would result in no tax liability, if made on commercial terms) or as a gift (which would result in a gift tax liability to Madoff).  Madoff understood that the transfer could also be structured as a bonus (which would result in an income tax liability to CC-1 and CC-2). Although Konigsberg provided accurate tax advice, Madoff, CC-1, and CC-2 used that advice to structure what purported to be tax-free loans but, in fact, were never intended to be repaid.[10]  On December 10, 2008—the day before Madoff's arrest—Madoff called Konigsberg to ask whether the loans he had given CC-1 and CC-2 had been converted into gifts, which would have created a substantial tax liability for Madoff while relieving CC-1 and CC-2 of any payment obligation.  In fact, as Konigsberg informed Madoff, Madoff and Konigsberg had never discussed the possibility of reclassifying the loans into gifts.

Separately, in or around 2002, Konigsberg became a partner with Madoff, Peter Madoff, CC-1, and CC-2 in a real-estate investment.  They later donated the property to a charitable

---

[8] ████████████████████████████████████████

[9] ████████████████████████████████████████████████

[10]  A "financial update" from CC-1 to Madoff dated October 19, 1995, stated:  "I have a promissory note with you that is for $600,000 at a 7% rate for three years.  I am supposed to pay you interest each year of $42,000.  Paul told me that the concept was to pay the interest for three years and then forget about the principal after December 2, 1997."  In proffer sessions with the Government, Konigsberg did not recall giving any such advice.

organization in order to obtain a large tax write-off. CC-1 and CC-2 then used backdated securities trades to generate millions of dollars in additional income, which enabled them to benefit from the entire deduction.

## B.  Konigsberg's Guilty Plea

On or about September 26, 2013, Konigsberg was indicted and subsequently arrested on charges of conspiring to falsify the records of a broker-dealer and an investment adviser, conspiring to commit ERISA fraud, falsifying records of a broker-dealer, falsifying records of an investment adviser, and falsifying statements in relation to documents required by ERISA. He was presented before the Honorable Debra C. Freeman, United States Magistrate Judge, and released on a bail package consisting principally of a $2 million personal recognizance bond, secured by $600,000 and three cosigners. On or about June 24, 2014, Konigsberg appeared before Your Honor, waived Indictment, and pled guilty pursuant to a cooperation agreement to the charges in a three-count Information.

Count One of the Information charged Konigsberg with conspiracy to (1) falsify books and records of a broker-dealer, (2) falsify books and records of an investment adviser, and (3) obstruct or impede the lawful governmental functions of the Internal Revenue Service in the ascertainment, assessment, computation and collection of income taxes, in violation of Title 18, United States Code, Section 371. Count One carries a maximum sentence of five years' imprisonment, a maximum term of three years' supervised release, a maximum fine under Title 18, United States Code, Section 3571(d) of the greatest of $250,000, twice the gross pecuniary gain derived from the offense, or twice the gross pecuniary loss to persons other than Konigsberg resulting from the offense, and a mandatory $100 special assessment.

Count Two charged Konigsberg with falsifying books and records of a broker-dealer, in violation of Title 15, United States Code, Sections 78q(a) and 78ff; Title 17, Code of Federal Regulations, Section 240.17a-3; and Title 18, United States Code, Section 2. Count Two carries a maximum sentence of 20 years' imprisonment, a maximum term of three years' supervised release, a maximum fine under Title 18, United States Code, Section 3571(d) of the greatest of $5 million, twice the gross pecuniary gain derived from the offense, or twice the gross pecuniary loss to persons other than Konigsberg resulting from the offense, and a mandatory $100 special assessment.

Count Three charged Konigsberg with falsifying books and records of an investment adviser, in violation of Title 15, United States Code, Sections 80b-4 and 80b-17; Title 17, Code of Federal Regulations, Section 275.204-2; and Title 18, United States Code, Section 2. Count Three carries a maximum sentence of five years' imprisonment, a maximum term of three years' supervised release, a maximum fine under Title 18, United States Code, Section 3571(d) of the greatest of $250,000, twice the gross pecuniary gain derived from the offense, or twice the gross pecuniary loss to persons other than Konigsberg resulting from the offense, and a mandatory $100 special assessment.

These offenses carry a total maximum sentence of incarceration of 30 years' imprisonment.

On the day of his guilty plea, Konigsberg also admitted the forfeiture allegations in the Information.  He agreed to forfeit $4.4 million to the Government, and to make restitution as ordered by the Court at sentencing.  After Konigsberg's guilty plea, Your Honor released Konigsberg on bail, pursuant to the terms in place since Konigsberg's presentment.  Pre-Trial Services reports that, since he was granted bail, Konigsberg has complied with all terms of his release.

### D.    Konigsberg's Cooperation and Substantial Assistance

In four lengthy proffer sessions with the Government, Konigsberg described in detail his participation in the criminal conduct set forth above.  He also contributed information gleaned from his unique perspective into discrete corners of Madoff's activities.  First, Konigsberg corroborated and supplemented evidence of how BLMIS co-conspirators executed aspects of their fraud.  Second, he helped the Government understand the role and assess the culpability of certain major BLMIS clients whose IA accounts reaped tremendous profits in the years before Madoff Securities collapsed.  Third, Konigsberg shared insights into the relationships and financial dealings between Madoff and those close to him.

The Government was unable to call Konigsberg to testify at the trial of Annette Bongiorno and her codefendants because he did not plead guilty until after that trial concluded.  Information Konigsberg provided in proffer sessions as early as October 2012 nevertheless assisted the Government's prosecution.  Konigsberg fortified the Government's understanding of the extent to which certain defendants directed aspects of the fraud, rather than merely carrying out Madoff's orders.  He also corroborated and added context to other evidence.  For example, statements by Konigsberg about replacing original account statements for Client-3 with backdated "amended" statements helped explain a note in Bongiorno's handwriting that stated, in reference to Client-3, "He told Bernie he sends everything to Paul & Paul told Bernie he shreds whatever he doesn't need!"  Similarly, Konigsberg's admission that he arranged for Relative-1 to receive a salary from BLIMIS was consistent with evidence about other "no-show" jobs.

Konigsberg was available to testify at the trial defendants' sentencing proceedings in late 2014.  The Government considered calling him to testify about his interactions with Bongiorno, but chose not to do so for reasons not attributable to Konigsberg.[11]  The Government had no doubts about the credibility or import of Konigsberg's potential testimony.

Information from Konigsberg also aided the investigation that culminated in the DPA with JPMorgan Chase Bank in January 2014, months before Konigsberg pled guilty.  The Statement of Facts accompanying the DPA described the bank's failure to, among other things, file a Suspicious Activity Report concerning the same "round-trip" transactions involving the Private Bank Client that Konigsberg had discussed with the Government as early as October 2012.  (*See* DPA Ex. C, ¶¶ 22-28).  In the Government's view, Konigsberg's statements about

---

[11]   The principal reason the Government did not call Konigsberg was that Bongiorno, uniquely among the trial defendants, did not seriously contest the loss amount attributable to her.

having noticed, questioned, and advised Madoff and the Private Bank Client to cease that activity in the Private Bank Client's accounts underscored the bank's responsibility for its own inaction.[12]

Konigsberg also assisted the Government's investigations of others who, for reasons not related to any deficiency in Konigsberg's cooperation, have not been charged.





[12] In particular, documents obtained from JPMorgan demonstrate that Konigsberg himself communicated with bank executives concerning this activity.

[13]

### E.  Section 5K1.1 Analysis

Section 5K1.1 of the Guidelines sets forth five non-exclusive factors that sentencing courts are encouraged to consider in determining the appropriate sentencing reduction for a defendant who has rendered substantial assistance.  *See* U.S.S.G. § 5K1.1(a).  The application of each of those factors to Konigsberg's cooperation is set forth below.

1.  "[S]ignificance and usefulness of the defendant's assistance" (§ 5K1.1(a)(1)): The Government benefited in myriad and substantial ways from Konigsberg's unique perspective into certain aspects of Madoff's and BLMIS's dealings.  Although neither an employee of nor the accountant for BLMIS, Konigsberg witnessed blatantly illegal activity in the Madoff Securities offices when he attended a meeting where Bongiorno backdated client account statements.  As an accountant to major BLMIS IA account-holders as well as an informal adviser to Bernard Madoff, Konigsberg also had valuable information about activities of certain BLMIS clients and others close to Madoff.

2.  "[T]ruthfulness, completeness, and reliability of any information or testimony" (§ 5K1.1(a)(2)):  In the Government's view, Konigsberg provided credible and candid information during his proffer sessions and would have provided truthful, powerful testimony had the Government called him to testify following his guilty plea.  He furnished details the Government could not possibly have learned on its own, even when those details highlighted Konigsberg's own culpability.  His account of sitting in Bongiorno's office as she repopulated Client-2's account statements to reflect different transactions is illustrative.  Instead of minimizing his own wrongdoing by leaving the misimpression that BLMIS co-conspirators backdated account statements only from a distance, Konigsberg placed himself in the room during plainly criminal conduct.  He acknowledged knowing what was happening and that it was wrong.  That willingness to confront and disclose the truth, even when it reflected poorly on his own conduct and would not have otherwise come to the Government's attention in such dramatic detail, is a hallmark of effective cooperation.

3.  "[N]ature and extent of the defendant's assistance" (§ 5K1.1(a)(3)):  Konigsberg's cooperation included four lengthy proffer sessions in which he answered every question the Government posed.  He revealed valuable information gathered from his diverse experiences with Madoff and BLMIS, from his professional accounting work for clients who invested with BLMIS, to his personal advice to Madoff himself, to his own investments with Madoff and others close to him, to his role in arranging for BLMIS to pay Konigsberg's relative an undeserved salary.  It bears emphasis that Konigsberg was and remains willing to provide additional assistance at the Government's request.

4.      "[A]ny injury suffered, or any danger or risk of injury to the defendant or his family resulting from his assistance" (§ 5K1.1(a)(4)):  Neither Konigsberg nor his family faced any physical danger as a result of his cooperation, but his involvement with the Madoff Securities fraud and his decision to cooperate came with a heavy price.  Konigsberg enjoyed a successful career in his own right, building and running an accounting firm where the vast majority of clients had no association whatsoever with Madoff or BLMIS.  That business has since been sold, with "Konigsberg" stripped from its name.  Konigsberg bears considerable responsibility for this turn of events.  But he also deserves credit for ultimately committing himself to his duties as a cooperating defendant even when doing so required him to confront his wrongdoing.  He described his knowing participation in illegal acts in sometimes vivid detail.  He admitted that he helped arrange a no-show job at BLMIS for Relative-1.  He revealed damaging information about clients he had worked with closely for years.  These admissions were a necessary part of the cooperation process.  But for Konigsberg and those close to him, they were also undeniably painful.

5.      "[T]imeliness of the defendant's assistance" (§ 5K1.1(a)(5)): Konigsberg first agreed to speak with the Government in October 2012.  After several proffer sessions, at which Konigsberg was represented by prior counsel, the Government offered Konigsberg a cooperation agreement.  Konigsberg declined the offer, which would have required him to plead guilty to certain crimes.  He then hired new counsel.  Ultimately, the Government was forced to indict Konigsberg in late September 2013, just days before the start of trial before Your Honor.  During the pendency of the trial, the parties had little discussion, although the Government produced all discovery to Konigsberg.  Having had the opportunity to review the discovery, as well as to observe the Government's witnesses during trial through his new counsel, who was often in the courtroom and received daily transcripts, Konigsberg agreed in June 2014 to plead guilty pursuant to a cooperation agreement.  Konigsberg thus missed the opportunity to provide concrete cooperation in the form of testimony at the trial of Annette Bongiorno and her co-defendants.

The Government nonetheless remained willing to enter into a cooperation agreement with Konigsberg after trial because, as set forth above, he was willing and available to testify at those defendants' sentencing hearings and in any later proceedings.  Specifically, his assistance was available and still useful with respect to investigations and charging decisions related to others.  Thus, although Konigsberg came slowly to cooperation and missed a substantial opportunity to assist the Government, his cooperation was still timely with respect to other aspects of the Government's investigation.

## CONCLUSION

As a result of the foregoing, the Government has determined that Paul J. Konigsberg has provided substantial assistance in the investigation of other persons.   The information he provided was truthful, complete, and reliable.   The Government therefore expects to request at sentencing that the Court sentence Konigsberg in light of the relevant facts stated above and the factors set forth in Section 5K1.1(a)(1)-(5) of the Sentencing Guidelines and Title 18, United States Code, Section 3553(e).

Very truly yours,

PREET BHARARA
United States Attorney


by:_____/s/ David M. Abramowicz_____
    David M. Abramowicz
    Assistant United States Attorney
    (212) 637-6525


cc:     Defense Counsel (via ECF)